## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

_____
:
UNITED STATES OF AMERICA,           :
                                    :
                    Respondent,     :          Criminal No. PJM-98-0520
                                    :
            v.                      :          Peter J. Messitte, U.S.D.J.
                                    :
DUSTIN JOHN HIGGS,                  :          Greenbelt Division
                                    :
                    Petitioner.     :
_____:

## PETITIONER'S MOTION FOR RELIEF FROM FINAL JUDGMENT PURSUANT TO *HAZEL-ATLAS GLASS CO. v. HARTFORD-EMPIRE CO.* AND FEDERAL RULE OF CIVIL PROCEDURE 60(d)

Petitioner, Dustin John Higgs, hereby moves for relief from this Court's final judgments denying him relief pursuant to 28 U.S.C. § 2255 or in the alternative pursuant to 28 U.S.C. § 2241 (Doc. 548); denying discovery (*id.*); denying a certificate of appealability (Doc. 560); and denying his motion to alter or amend the judgment pursuant to Federal Rule of Civil Procedure 59(e) (Doc. 561). Mr. Higgs makes this motion pursuant to *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944), and Federal Rule of Civil Procedure 60(d). In support of this motion, Mr. Higgs states the following:

### INTRODUCTION

Dustin Higgs is currently on death row, having been convicted and sentenced to death for murder and related charges in this Court. Victor Gloria was the most important witness at Mr. Higgs's trial. Indeed, in the opinion of the trial prosecutor, "the government could not have proceeded and obtain[ed] a conviction against Mr. Higgs certainly without the assistance of Mr.

1

Gloria."  Exhibit 1 at 4 (argument of AUSA Deborah Johnston during Mr. Gloria's sentencing

hearing in support of a motion for downward departure due to Mr. Gloria's "substantial

assistance to the government").

As part of the § 2255 proceedings in this Court challenging Mr. Higgs's convictions and

sentences, Mr. Higgs alleged that the government did not turn over all of the material relating to

Mr. Gloria that it was required to under *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United*

*States*, 405 U.S. 150 (1972), and their progeny.  Specifically, Mr. Higgs alleged that Mr. Gloria

was a suspect, but was never charged, in an unrelated homicide in Baltimore that was committed

prior to the time of Mr. Higgs's trial.  Doc. 492 at 33.  Mr. Higgs further alleged that Mr. Gloria

was not charged with this homicide at the behest of the government "in an effort to preserve his

status as a testifying witness in this federal capital triple homicide case." *Id.*  Mr. Higgs alleged

that the government's failure to disclose this favorable treatment of Mr. Gloria violated Mr.

Higgs's due process rights. *Id.*

The government responded to Mr. Higgs's § 2255 allegation regarding Mr. Gloria by

denying that federal officials had any knowledge of or ability to influence any benefits conferred

on Mr. Gloria by local authorities in Baltimore, dismissing the allegation as speculative, and

urging the denial of relief.  Doc. 520 at 85-88.  This Court denied Mr. Higgs's claim, adopting

the government's line of argument.  The Court ruled that "pure speculation about supposed

benefits cannot substitute for hard facts," and that "Higgs, quite simply, has failed to demonstrate

any causal connection between Gloria's testimony in this federal case and whatever treatment he

may have received in the state jurisdictions." *United States v. Higgs*, 711 F. Supp. 2d 479, 508

(D. Md. 2010).

Mr. Higgs has now obtained the Baltimore City Police file for the homicide in which he alleged Mr. Gloria was an uncharged suspect.  The contents of the file reveal that: 1) Mr. Gloria was indeed a suspect in the Baltimore murder, having been identified as the killer by multiple eyewitnesses; 2) at least as early as February 2, 1999, Detective Joseph Green of the United States Park Police was aware that Mr. Gloria was a suspect in the murder; 3) on April 12, 1999, Assistant United States Attorney Deborah Johnston spoke with Mark Cohen, then the chief of the homicide division of the Baltimore City State's Attorney's Office, about the fact that Mr. Gloria was a suspect in the Baltimore homicide; 4) during this conversation, AUSA Johnston suggested to Mr. Cohen that it was possible Mr. Gloria did not commit the killing because, in her estimation, the eyewitnesses who identified him had a motive to lie; 5) the Baltimore City Police embraced AUSA Johnston's proffered theory of Mr. Gloria's innocence of the murder and declined to charge Mr. Gloria with any crime; and 6) the Baltimore City State's Attorney's Office would have charged Mr. Gloria with the murder absent the intervention of federal officials, including AUSA Johnston, Detective Green, Detective Rydi Abt of the Park Police, and Agent Bradlee Sheafe of the FBI.  In sum, the government knew that Mr. Higgs's allegation was supported by "hard facts," but made false representations to this Court during the § 2255 litigation in order to prevail.

The government's representations during the course of the § 2255 proceedings therefore constitute fraud on the Court, and merit relief from the Court's final judgment denying discovery and post-conviction relief under *Hazel-Atlas* and Federal Rule of Civil Procedure 60(d)(3).  Not only has the government now been engaged in a years-long *Brady* violation, but officers of this Court representing the government have made materially false statements in their continuing

3

attempt to cover up the violation.  AUSA Johnston signed the government's pleading that faulted

Mr. Higgs for failing to demonstrate any connection to federal officials regarding the "supposed"

benefits obtained by Mr. Gloria.  It is now clear that multiple federal officials, including AUSA

Johnston, had intimate involvement in the conferring of these benefits, which were directly

related to Mr. Gloria's testimony in this case.  The government's misrepresentations to this Court

in a death penalty case, which formed the basis for the Court's denial of relief, merit relief from

the final judgments.

Mr. Higgs submits that this motion, and the exhibits thereto, demonstrate his entitlement

to relief under Fourth Circuit and United States Supreme Court precedent.  At a minimum, Mr.

Higgs requests that he be granted an evidentiary hearing at which he will prove these serious

allegations.  Further, a probing inquiry is necessary into what additional undisclosed *Brady*

and/or *Giglio* material remains in the hands of the government.  Mr. Higgs therefore also requests

to be heard on the renewed *Brady*/*Giglio* discovery request that he has filed contemporaneously

with this motion.

## PROCEDURAL HISTORY

On December 21, 1998, Mr. Higgs, along with co-defendant Willis Haynes, was indicted

on charges connected with the January 27, 1996, shooting deaths of Tanji Jackson, Tamika

Black, and Mishann Chinn.  On October 22, 1999, the government filed a notice of its intent to

seek the death penalty against Mr. Higgs.  On December 20, 1999, the grand jury returned a

second superseding indictment, and the government thereafter filed an amended death notice.

The cases against Mr. Haynes and Mr. Higgs were severed for trial.  Mr. Haynes – by all

accounts the person who actually killed Ms. Jackson, Ms. Black, and Ms. Chinn[1] – was tried first and sentenced to life in prison without release.  Mr. Higgs was tried next, and on October 11, 2000, was found guilty of firearms charges and three counts each of first-degree premeditated murder, first-degree murder committed during a kidnapping, and kidnapping resulting in death. Following a sentencing hearing, the jury recommended death sentences on the nine death-eligible counts.

The Fourth Circuit upheld the convictions and sentences on direct appeal.  *United States v. Higgs*, 353 F.3d 281 (4th Cir. 2003) (*Higgs-1*).  While the direct appeal was pending, Mr. Higgs filed a motion for a new trial, alleging that the government had withheld *Brady* material relating to two witnesses.  This Court denied the motion for new trial, and the Fourth Circuit again affirmed.  *United States v. Higgs*, 95 Fed. Appx. 37 (4th Cir. 2004) (*Higgs-2*).  Certiorari was denied with respect to each appeal.  *Higgs v. United States*, 542 U.S. 999 (2004); *Higgs v. United States*, 543 U.S. 1004 (2004).

Mr. Higgs then filed his *Motion for Relief Pursuant to 28 U.S.C. Section 2255 or in the Alternative Pursuant to 28 U.S.C. 2241* on November 28, 2005.  Doc. 492.  He also moved for discovery and a hearing on several of his claims.  *Id.*; *see also* Doc. 509.  On April 7, 2010, this Court denied the § 2255 motion without argument, discovery, or a hearing.  *United States v. Higgs*, 711 F. Supp. 2d 479 (D. Md. 2010) (*Higgs-3*); *see also* Doc. 548 (Final Judgment Order). The Court denied Mr. Higgs's motions for reconsideration and for a certificate of appealability (COA) on July 20, 2010.  Docs. 560, 561.

---

[1]*See, e.g.*, *United States v. Haynes*, 26 Fed. Appx. 123, 127 (4th Cir. 2001) (unpub.) (describing how "Haynes exited the vehicle and fired five shots, killing all three women").

Mr. Higgs then sought a COA from the Fourth Circuit on numerous issues, including that the government improperly suppressed the benefit Mr. Gloria received in avoiding a first degree murder charge in Baltimore. The Fourth Circuit denied a COA on all but one issue, regarding the government's withholding of exculpatory material relating to comparative bullet lead analysis and counsel's ineffectiveness in handling the issue, and subsequently denied relief. *United States v. Higgs*, 663 F.3d 726 (4th Cir. 2011) (*Higgs-4*). The United States Supreme Court denied certiorari on December 10, 2012. *Higgs v. United States*, 133 S.Ct. 787 (2012).

## STATEMENT OF FACTS

### A.    Victor Gloria's Trial Testimony

During the early morning hours of January 27, 1996, Ms. Jackson, Ms. Black, and Ms. Chinn were found murdered along Route 197 in the Patuxent National Wildlife Refuge in Prince George's County, Maryland. Victor Gloria was the most significant witness at Mr. Higgs's trial on the charges arising from these murders. According to AUSA Johnston, the government "could not have proceeded and obtain[ed] a conviction against Mr. Higgs" without Mr. Gloria's testimony. Exhibit 1 at 4 (Gloria sentencing hearing). This Court concurred in that assessment. *Id.* at 16 (describing Mr. Gloria as "the critical link in the conviction of these two men," and finding that "[t]hat is the most important thing about [Gloria] at this point in the sentencing, and it overrides everything else"); *see also Higgs-1*, 353 F.3d at 289 (noting that "[m]ost of the facts surrounding the murders of the three women were obtained from [Gloria's] eyewitness testimony"); *Higgs-4*, 663 F.3d at 730 ("At trial, [Gloria] provided a detailed, eyewitness account of the kidnappings and murders"); *id.* at 741 ("Gloria's eyewitness testimony provided compelling and convincing details of the events of that evening and of Higgs's involvement in

them").

Mr. Gloria testified to a number of highly damaging facts relating to Mr. Higgs's involvement in the killings.  Mr. Gloria testified, for example, that the three victims were socializing at Mr. Higgs's apartment on the night of the killings with Mr. Haynes, Mr. Gloria, and Mr. Higgs, when Mr. Higgs got into an argument with Ms. Jackson.  *Higgs-1*, 353 F.3d at 289-90.  According to Mr. Gloria, this argument led Mr. Higgs to want to have the victims killed. *Id.*  Mr. Gloria testified that after the three women left the apartment following the fight, Mr. Higgs got a gun and told Mr. Haynes to get the three women into Mr. Higgs's vehicle.  *Id.* at 290. Finally, Mr. Gloria testified that he then got in the back seat of Mr. Higgs's vehicle and observed Mr. Higgs drive the three women to a secluded location along Route 197 while having whispered conversations with Mr. Haynes, pull over, and hand Mr. Haynes the gun with which to carry out the killings.  *Id.*  Mr. Gloria was the only source of this direct, highly damaging testimony.

**B.      The Murder of Martrelle Creighton**

On July 18, 1998, approximately two and a half months prior to Mr. Gloria's arrest in this federal case, a man named Martrelle Creighton was murdered in the Inner Harbor area of Baltimore.[2]  Exhibit 2 (Report of Baltimore Police Detective Robert L. Patton, 7/18/98).  At approximately 2:00 a.m. on July 18, Mr. Creighton was found by police lying on the sidewalk near 301 Light Street, suffering from a single stab wound to the neck.  *Id.*

As discussed below, the fatal wound was consistent with having been inflicted by a single

---

[2]Although law enforcement suspected the involvement of Mr. Gloria in the federal case early on in their investigation, Mr. Gloria was not arrested until almost three years after the Route 197 murders, on October 5, 1998.  Thus, on the date of Mr. Creighton's murder, Mr. Gloria was not yet in custody.

blow, which could have appeared to onlookers to be a punch.  Witnesses told police that both Victor Gloria and Kevin Miller swung at the decedent during an altercation, and several said that Mr. Gloria was the first to run away.  Thus, either Mr. Gloria or Mr. Miller could have been the person who stabbed Mr. Creighton.

Mr. Creighton was immediately transported to the University of Maryland Shock Trauma Center for treatment, but was pronounced dead at approximately 2:30 a.m.  Exhibit 2.

Baltimore Police soon learned that Mr. Creighton's murder was precipitated by two groups of young men arguing over a group of young women.  *Id.*  One of the groups of men was comprised of Mr. Creighton and his friends.  *Id.*  The other group of men was comprised of Kevin Miller, twin brothers Keith and Kevin Scott, and Victor Gloria.  Exhibit 3 (Report of Report of Baltimore Police Detective Robert L. Patton, 2/2/99).

The trouble in the Inner Harbor began when Mr. Creighton's group attempted to strike up a conversation with the group of young women.  Exhibit 2.  The young women, who did not previously know anyone in Mr. Creighton's group, were not interested.  *Id.*  Shortly thereafter, the young women began talking with Mr. Gloria's group, who they also had not known previously.  *Id.*  Mr. Creighton apparently then became angry that the young women were talking to members of Mr. Gloria's group given that they had been uninterested in talking with Mr. Creighton's group.  *Id.*  As a result, Mr. Creighton began yelling at the young women as well as at Mr. Gloria's group.  *Id.*  With minor variations, every witness interviewed by Baltimore Police, which included members of Mr. Creighton's group, members of the group of young women, and Mr. Miller and the Scott twins, gave essentially the same account of the lead up to the stabbing.

At that point, however, the accounts began to differ somewhat.  Clarence White, a friend of Mr. Creighton's, was interviewed by Baltimore Police on the night of the stabbing.  Exhibit 4 (information sheet regarding interview of Clarence White, 7/18/98).  Handwritten police notes from this unrecorded interview indicate that Mr. White described how once the altercation began, a man with "light skin" – a description consistent with Mr. Gloria – swung at Mr. Creighton, at which point Mr. Creighton "grabbed his neck and was bleeding bad."  Exhibit 5 (handwritten notes from interview of Clarence White).[3]  Mr. White also stated that there were three or four members of the stabber's group, who all ran away together after the stabbing.  *Id.*  Mr. White was reinterviewed nearly a year later, on June 11, 1999, at which point he changed his account to indicate that the stabber was "brown skinned," a description more consistent with Mr. Miller.  Exhibit 6 (transcript of interview with Clarence White, 6/11/99).  Mr. White also stated in the second interview that he definitely saw three people involved in the altercation with Mr. Creighton.  *Id.*  Mr. White identified the three individuals involved as the Scott twins and Mr. Miller at that time.  *Id.*

David Bishop, another friend of Mr. Creighton's, was also interviewed on the night of the stabbing and said that he saw both a man matching the description of Mr. Miller and a man matching the description of Mr. Gloria punch Mr. Creighton.  Exhibit 7 (transcript of interview with David Bishop, 7/18/98).  Mr. Bishop did not initially realize that Mr. Creighton had been stabbed, although Mr. Bishop assumed once he realized that Mr. Creighton had been stabbed that it was Mr. Miller who did the stabbing.  *Id.*

---

[3] Mr. White's description must refer to Mr. Gloria.  While the Scott twins are also light skinned, none of the witnesses asserted that either of them punched Mr. Creighton.

Sisters Barbara and Charnetta Bailey, who were in the group of young women, were initially interviewed by police on July 29th, 1998, and August 12th, 1998, respectively.  Exhibit 8 (transcript of interview with Barbara Bailey, 7/29/98); Exhibit 9 (transcript of interview with Charnetta Bailey, 8/12/98).  Both women said that around the time the confrontation between the two groups of men started, they started to walk away.  *Id.*  Both women also stated that at the beginning of the altercation they saw Mr. Gloria run away and Mr. Creighton and Mr. Miller then engaged in a brief fistfight in which Mr. Miller punched Mr. Creighton.  *Id.*  Neither Bailey sister realized that Mr. Creighton had been stabbed.  *Id.*

The Scott twins were first interviewed by police on February 2, 1999, when they were arrested in connection with the stabbing.  The Scott twins each said that it was Mr. Gloria who stabbed Mr. Creighton, although they, too, did not initially realize that Mr. Creighton had been stabbed.  Exhibit 10 (transcript of interview with Keith Scott, 2/2/99); Exhibit 11 (transcript of interview with Kevin Scott, 2/2/99).  The Scott twins both said that Mr. Gloria punched Mr. Creighton and then ran away, and that they did not see Mr. Miller fighting with Mr. Creighton at all.  *Id.*

Mr. Miller was arrested and interviewed by police on April 7, 1999.  Mr. Miller also said that Mr. Gloria punched Mr. Creighton and then ran away.  Exhibit 12 (transcript of interview with Kevin Miller, 4/7/99).  Mr. Miller said that he himself then threw a punch at one of Mr. Creighton's friends, but never hit Mr. Creighton.  *Id.*  Mr. Miller denied stabbing Mr. Creighton and stated that he did not realize when he began fighting that Mr. Creighton had been stabbed.  *Id.*

There is no indication that Baltimore Police ever interviewed or attempted to interview

Mr. Gloria, despite the fact that he had previously pled guilty to threatening a different individual with a knife during a fight.  Exhibit 13 (Application for Statement of Charges, 9/28/96).

Baltimore Police were thus left with conflicting accounts of who stabbed Mr. Creighton. Some of the accounts tended to suggest that it was Mr. Gloria, and some of the accounts tended to suggest it was Mr. Miller.  All of the accounts described a chaotic atmosphere, with almost no one initially having realized that Mr. Creighton had been stabbed.

**C.    The Involvement of Federal Authorities in the Investigation into Mr. Creighton's Murder**

The first indication in the Baltimore Police file of federal authorities' knowledge of and involvement in the investigation into the Creighton murder is a handwritten note dated February 2, 1999 – the same day the Scott twins identified Mr. Gloria as the killer.  Exhibit 14 (handwritten note, 2/2/99).  That note lists the names of Detectives Rydi Abt and Joseph Green of the United States Park Police, along with Detective Green's office and pager numbers.  *Id.*  It also lists the number for the Park Police Criminal Investigations Bureau.  *Id.*  Immediately under the names and telephone numbers is the following notation: "JAN '96 – 3/B/F victims shot to death on BW Pkwy."  *Id.*  Under that notation is the notation "Dec '98 – 3 arrest made," followed by the names of Mr. Haynes, Mr. Higgs, and Mr. Gloria, along with certain other identifying information.  *Id.*  In other words, the very day that Mr. Gloria was named as the killer of Mr. Creighton, Baltimore authorities were in contact with the federal authorities responsible for Mr. Higgs's prosecution.

Detective Green had further contact with Baltimore Police the following day, February 3, 1999.  On that date, Detective Green retrieved a photographic lineup previously created by the

Park Police, which included Mr. Gloria, and provided it to the Baltimore Police.  Exhibit 15 (envelope, request form, and photo lineup provided by Detective Green, 2/3/99).

The Baltimore Police file also contains a handwritten note dated one week later, February 10, 1999, which includes the notation: "Case Agent for Victor Gloria S/A Brad Sheafe FBI Calverton Office."  Exhibit 16 (collection of handwritten notes).  Under this notation are two different telephone numbers.  *Id.*  Several additional, undated, handwritten notes also contain the names of Detective Green and Detective Abt, along with telephone numbers and information relating to the murders on Route 197.  Exhibit 17 (undated handwritten note); Exhibit 18 (undated handwritten note); Exhibit 19 (undated handwritten to-do list).

At some point, a member of the Baltimore Police Department traveled, or at least planned to travel, to the physical office of the United States Park Police, presumably in order to meet with a Park Police officer regarding Mr. Gloria.  Exhibit 20 (undated handwritten note with the words "Directions to U.S. Park Police" written across the top, underneath which are directions from Baltimore to the Park Police office).

The Creighton file further reveals that, not only were members of the Baltimore Police Department in contact with federal law enforcement agents, but the chief homicide prosecutor in the Baltimore City State's Attorney's Office, Mark Cohen, was in direct communication with AUSA Deborah Johnston, who prosecuted Mr. Higgs at trial and represented the government during Mr. Higgs's § 2255 proceedings.  Exhibit 21 (handwritten note from Mark Cohen, 4/12/99).  The note recounting the Johnson-Cohen conversation, authored by Mr. Cohen on April 12, 1999, reveals that Ms. Johnston on that date suggested to Mr. Cohen that Mr. Miller and the Scott twins might be falsely implicating Mr. Gloria.  *Id.*  The note also reveals that Mr. Cohen,

the person with the authority to bring charges against Mr. Gloria for the Baltimore homicide, was

inclined to charge Mr. Gloria, but deferred his decision until after he received "background"

information from federal agents regarding the unrelated investigation into the Route 197

homicides.  *Id.*  Mr. Cohen's note is reproduced here in full:

Bobby

     Re Victor Gloria

1   I spoke to AUSA Deborah Johnston concerning Victor Gloria on 4/12/99.  She
told me that Gloria pled guilty to AAF in triple murder case + that his plea
agreement is sealed.  The two Co-Δ's Willis Haynes + Dustin Higgs have trial
date of 2-7-2000.  Because plea agreement is sealed, she could not tell me if
Gloria is going to testify agt. Co-Δ.

2   AUSA Johnston stated that it is possible that Co-Δ's - Scott, Scott + Miller are
blaming Gloria because they are friends of Δ's in her case especially Haynes.  She
suggested we talk to

     ①   Joe Green Park Police
          B - [phone number]

     ②   Brad Sheafe - FBI
          B - [phone number]

     -they could give us background on case

3   After we talk to these officers, we will decide on next course of action, that is,
either writ Gloria + charge him or talk to his lawyer about the case.

4   Please call me

Mark Cohen

*Id.*

While Mr. Cohen reported in his memo that the United States Attorney's Office could not

share whether Mr. Gloria was going to testify against Mr. Higgs and Mr. Haynes because his plea

agreement was sealed, the reluctance to share this information was apparently short-lived.  In a

report dated April 21, 1999, Baltimore Police Detective Robert Patton noted that "[p]er the U.S.

Attorney's office Victor Gloria had plead guilty and is slatted to testify against his co-defendants,

Willis Haymes and Dustin Higgs who are reportedly are close friends with the Scott brothers and

Kevin Miller."  Exhibit 22 (Report of Detective Patton, 4/21/99) (text reproduced as it appears in

original).  Detective Patton's report continues by noting that the United States Attorney's Office

conveyed to Baltimore authorities its belief, ostensibly based on the unrelated federal

investigation, that all three eyewitnesses who identified Mr. Gloria as the murderer were falsely

implicating him as a form of retaliation due to their friendship with Mr. Haynes and Mr. Higgs:

> The U.S. Attorney's Office was advised by A.S.A. Cohen that Kevin Miller and
> the Scott brothers had implicated Victor Gloria in the captioned Homicide.  The
> U.S. Attorney reported that during course of their Investigation they received
> information that the Scott brothers and Kevin Miller were close friends with
> Victor Gloria's co-defendant, Willis Haymes and Dustin Higgs and were aware
> that Victor Gloria was a Federal witnesses and planed to testify against Hymes
> and Higgs.  The U.S. Attorney believes that the implication of Victor Gloria by
> Kevin Miller and the Scott brothers is their form of retaliation against Gloria.

*Id.* (text reproduced as it appears in original).

> The report then notes that:

> Your Investigators along A.S.A. Cohen believes that the A.U.S.A. is on track with
> their assumption.  Your Investigators support is based on eyewitness information
> that Victor Gloria ran from the scene prior to the stabbing.  The eyewitnesses
> identified Kevin Anthony Miller via photographic line up as the stabber and the
> only person seen engaging the victim in physical altercation.

> In an effort to finally discern who of the four listed suspects actually stabbed the
> victim.  Your Investigator in concert with A.S.A. Cohen believe by aggressively
> re-interviewing the Scott brothers we could ultimately convince them to tell the
> complete truth.  This would clear up the apparent inconsistencies in their
> statements and ultimately discern from them who the actual stabber was which
> would corroborate the other eyewitnesses.

14

*Id.* (text reproduced as it appears in original).

In sum, the intervention of federal officials had a direct impact on Mr. Gloria not being charged with first degree murder in the death of Mr. Creighton.  Federal officials' only interest in intervening in the investigation of this quintessentially local crime was Mr. Gloria's status as a witness in a federal capital case.[4]

**D.      The Resolution of the Case Arising from Mr. Creighton's Murder**

As a result of the Baltimore Police Department's investigation of Mr. Creighton's murder, Mr. Miller and each of the Scott twins were charged with first degree murder.  Exhibit 23 (Scott indictment); Exhibit 24 (Miller indictment).  Mr. Gloria was the only member of this group not charged with first degree murder; he received no charges at all arising from this incident.

Each of the Scott twins entered pleas to second degree assault and were sentenced to time served.  Exhibit 25 (Keith Scott docket); Exhibit 26 (Kevin Scott docket).  They were released from custody on August 30, 1999, having served approximately seven months in jail.  *Id.*  Mr.

---

[4]Further, it is not clear what aspect of the federal investigation would have shed any light on the supposed friendships between Mr. Miller, the Scott twins, and either Mr. Haynes or Mr. Higgs.  Neither the Scott twins nor Mr. Miller had any involvement in the Route 197 homicides.  Mr. Higgs proffers, and will prove at a hearing if necessary, that Mr. Gloria was the source of this self-serving information, as federal officials specifically questioned Mr. Gloria about his involvement in the Baltimore homicide during the course of his cooperation with them.

Moreover, Mr. Higgs submits that the representations that AUSA Johnston made to Mr. Cohen about the supposed friendships were largely inaccurate.  Mr. Higgs hereby represents to the Court that he was not, in fact, friends with either the Scott twins or Mr. Miller.  And while it does appear that Mr. Miller was friends with Willis Haynes, the same cannot be said for the Scott twins.  As such, AUSA Johnston's representations to Mr. Cohen do not provide a reasonable basis on which to conclude that the Scott twins and Mr. Miller went out of their way to falsely implicate Mr. Gloria as a form of retaliation.

Miller pled guilty to second degree murder, however pursuant to a negotiated plea agreement he received an extraordinarily low sentence given that he supposedly killed a man in the middle of downtown by stabbing him in the neck: twenty years, with all but five years suspended.  Exhibit 27 (Kevin Miller docket).  This five-year sentence was made concurrent to any other sentence, with credit for time already served.  *Id.*; Exhibit 28 (Kevin Miller sentencing worksheet); Exhibit 29 (Kevin Miller commitment record).  Mr. Miller also received three years of probation upon release.  *Id.*  The judge who sentenced Mr. Miller, Judge Quarles (then a judge for the Circuit Court for Baltimore City), justified his extreme downward departure from the guidelines range as follows: "muddled factual statement leaves few things clear: someone died and the Def. was involved."  Exhibit 28.

Mr. Miller did not serve his full five-year term; he was released from prison in July, 2002, three years and three months after he was first arrested.  Exhibit 30 (Memorandum from Maryland Department of Public Safety and Correctional Services).

**E.    Mr. Higgs's Discovery and *Brady* Requests at Trial and During § 2255 Proceedings**

Mr. Higgs made his first *Brady* request at the time of trial, by entering into a joint written agreement with the government.  In that agreement, which is signed by both of Mr. Higgs's defense attorneys and by AUSAs Deborah Johnston and Sandra Wilkinson, the government agreed to provide *Jencks* and *Giglio* material no later than one week prior to trial.  The government further agreed to provide *Brady* material not otherwise covered by Fed. R. Crim. P. 16, *Jencks*, or *Giglio*, "if and when discovered."  Exhibit 31 (Discovery agreement, 1/21/99).[5]

---

[5]Immediately prior to trial, AUSA Johnston acknowledged the importance of each party making timely and full disclosures in discovery:

During § 2255 proceedings, Mr. Higgs made another request for discovery and for *Brady*

material.  Doc. 509.  In that motion, Mr. Higgs specifically referenced Mr. Gloria's involvement

in the Baltimore homicide.  *Id.* at 11-12.  Mr. Higgs requested any information in the possession

of the Baltimore City State's Attorney's Office "regarding Mr. Gloria's participation in and/or

non-prosecution for the above described homicide." *Id.* at 12.  Mr. Higgs also made a more

general request for "all relevant and exculpatory witness and law enforcement statements" not

previously provided.  *Id.* at 17.

At no point, either at trial or during § 2255 proceedings, did the government disclose the

fact that Mr. Gloria had been identified by multiple eyewitnesses as the killer of Mr. Creighton,

that federal authorities had been in contact with state authorities responsible for the Baltimore

murder investigation, or that Mr. Gloria was not charged in the Baltimore homicide, almost

certainly as a result of federal authorities' intervention.

**F.     Mr. Higgs's Allegations During § 2255 Proceedings**

During the course of Mr. Higgs's initial investigation during § 2255 proceedings, Mr.

Higgs's counsel learned that Mr. Gloria had been a suspect in a Baltimore murder, but was not

---

The other issue is in regard to discovery, and there are two issues.
Yesterday Mr. Sullivan delivered to us after the close of court a letter saying that
they were compiling their evidence, the documents and tangible objects that they
are required to provide to the government under the reciprocal rule, 16(b)(1)(A).

We have not gotten anything.  The whole purpose of these rules and
reciprocal discovery is so that no one should go into trial without having that
discovery provided to them.  Here we are Friday and the trial is scheduled to begin
on Tuesday and we have not received any of those materials.

I mentioned this to Mr. Sullivan this morning while the Court was
conducting its sentencing hearing.  So Mr. Sullivan is aware of our concerns.
Like a defendant should not be tried by ambush, neither should the government.

Tr. 9/22/00 at 136-37.

prosecuted because he was to be the star witness in two federal capital cases.  In light of this information, Mr. Higgs alleged that the government did not turn over all of the material relating to Mr. Gloria that it was required to under *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny.  Specifically, Mr. Higgs alleged that Mr. Gloria was a suspect, but was never charged, in an unrelated homicide in Baltimore.  Doc. 492 at 33.  Mr. Higgs further alleged that Mr. Gloria was not charged with this homicide at the behest of the government, "in an effort to preserve his status as a testifying witness in this federal capital triple homicide case," and that the government's failure to disclose this consideration violated Mr. Higgs's due process rights.  *Id.*

**G.     The Government's Representations to This Court in Response to Mr. Higgs's Claim**

In its response to Mr. Higgs's § 2255 motion, the government made several materially false and/or misleading representations.  The government argued that Mr. Higgs's "vague descriptions of the supposed benefits conferred on Gloria largely fail to demonstrate any connection to this trial or federal officials."  Doc. 520 at 88.  The government described Mr. Higgs's allegations regarding the undisclosed leniency afforded to Mr. Gloria as mere "speculation about the Government's knowledge or actions."  *Id.*  The government further argued that "[c]ertainly, the Constitution required the prosecutors to disclose any consideration promised to Gloria in exchange for his testimony; the prosecutors, however, had no duty or ability to predict, much less inform Higgs of benefits, or acts of grace, that coincidentally flowed to the witness after this trial."  *Id.* at 86.  The government also resisted Mr. Higgs's discovery and *Brady*/*Giglio* requests pertaining to Mr. Gloria, arguing that "there is no evidence that [Gloria] was promised anything other than that which he admitted at trial."  Doc. 513 at 5.

18

Each of the above statements in the government's pleadings faulted Mr. Higgs for his failure to prove his *Brady* claim, when the government all the while was in possession of the evidence that, in all likelihood, would have proved it.  Given that the government has a constitutional and ethical duty to disclose *Brady* and *Giglio* material, the government's representations created the false impression that federal authorities had no knowledge of or involvement in Baltimore authorities' investigation into or treatment of Mr. Gloria for an unrelated crime.  AUSA Johnston, who, as noted, was in direct contact with the Baltimore authorities prior to Mr. Higgs's trial, signed her name to the government's opposition to the § 2255 motion, as well as to the government's opposition to the discovery motion.  Doc. 520 at 1; Doc. 513 at 8.

**H.    Mr. Higgs's Attempts to Obtain and Ultimate Acquisition of the Baltimore Police File**

Mr. Higgs's post-conviction counsel first learned of Mr. Gloria's involvement in the Baltimore homicide during their investigation in advance of filing Mr. Higgs's § 2255 motion. While Mr. Higgs possessed some information about Mr. Gloria's involvement and the federal government's intervention, he did not at the time of the § 2255 proceedings have documentary evidence to confirm the federal government's direct involvement in the investigation into Mr. Creighton's murder.  As such, Mr. Higgs sought to obtain documentary evidence to confirm the information he had.  Mr. Higgs sought to do so both through his own investigative efforts and via specific discovery requests in this post-conviction litigation.  Mr. Higgs sent a written request for the complete investigation file to the Baltimore Police and filed a discovery motion in the § 2255 litigation.  Mr. Higgs was unsuccessful, however, as the Baltimore Police only turned over a one-

page summary report and the government opposed Mr. Higgs's § 2255 discovery requests, which this Court denied.

In the spring of 2012, Mr. Higgs attempted, a second time, to obtain the Baltimore Police file via written request.  Whereas the Baltimore Police responded to Mr. Higgs's first written request by turning over a one-page summary report, they responded to his second written request by turning over their entire investigative file, with some information redacted.[6]  Mr. Higgs came into possession of the file in September, 2012.

Mr. Higgs has simultaneously been attempting to obtain – also since 2012 – a copy of the United States Park Police file relating to the murders on Route 197 via the Freedom of Information Act (FOIA).  Given the seriousness of the accusations Mr. Higgs is now leveling against the government, and the lack of a time restriction for filing motions under Rule 60(d)(3), Mr. Higgs has endeavored to exhaust his attempts to obtain the Park Police file (and thereby confirm the full extent of the government's knowledge and actions) prior to filing this motion. Mr. Higgs submits that, given the contents of the Baltimore Police file, the Park Police file will almost certainly contain confirmation of the connection between federal and local officials in the investigation into Mr. Creighton's murder and will likely provide additional evidence of government misconduct.

The Park Police have been extraordinarily dilatory in their response to the FOIA request. It has now been almost 3 years since Mr. Higgs made his request.  The Park Police initially responded by seeking to charge over $11,000 to copy and produce the investigative file.  When

---

[6]There is no apparent reason why the two requests were handled so differently by the Baltimore Police.

20

counsel for Mr. Higgs protested that such fees were excessive and clearly precluded by the FOIA statute, the Park Police refused to reconsider and directed Mr. Higgs to file an administrative appeal if he was unhappy with the fees.  Mr. Higgs did so, and given that the law clearly precluded the Park Police from attempting to charge such extreme fees, he succeeded in his initial appeal.

Upon remand to the Park Police, Mr. Higgs paid the much lower fee that the Park Police was legally entitled to charge.  The Park Police then took over a year to respond to the substance of the request, despite numerous follow-up attempts by counsel in the interim.  In its brief eventual response, the Park Police informed Mr. Higgs that it would be withholding its investigative file *in toto*.  Mr. Higgs yet again filed an administrative appeal challenging this determination.  The FOIA appeals officer took an additional ten months before finally ruling on the appeal in September, 2014.  The most recent appeal ruling indicated that, not only had the Park Police failed to fully review the contents of its file during the year-plus in which it was supposedly considering Mr. Higgs's request, they had also substantially miscalculated the number of documents that were responsive to the request.  The FOIA appeals office yet again remanded to the Park Police to conduct an appropriate review.

In light of the extreme delay in responding that has characterized the Park Police's activities to date, the most recent appeal opinion directed that the Park Police would have twenty (20) workdays in which to offer its initial response to Mr. Higgs regarding the FOIA request. The Park Police have completely ignored that deadline.  Despite further follow-up from counsel, it has become apparent at this point that the Park Police simply are not going to respond to the FOIA request in a remotely timely fashion.  While Mr. Higgs would prefer to obtain the Park

21

Police file before filing this motion, thereby permitting him to create a full record of the government's misconduct, such an eventuality is extraordinarily unlikely given the Park Police's conduct.  As such, Mr. Higgs is filing this motion based on the information known to him at this moment.  As noted above, Mr. Higgs is simultaneously filing a renewed *Brady*/discovery motion to enlist the Court's assistance in obtaining additional documents related to this violation.

## ARGUMENT

### I.   RELIEF IS APPROPRIATE UNDER *HAZEL-ATLAS* AND RULE 60(D)(3) AS A RESULT OF THE GOVERNMENT'S FRAUD ON THIS COURT.

Federal Rule of Civil Procedure 60(d)(3) vests in courts the power to "set aside a judgment for fraud on the court."  The fraud on the court doctrine derives from the United States Supreme Court's decision in *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944).  In *Hazel-Atlas*, the Court set aside a fraudulently obtained ruling that was the product of one party's procurement and presentation of false evidence and misrepresentations to the court.  *Id.* at 239-43.  As the Court described it, the fraud was the product of a "deliberately planned and carefully executed scheme" that severely undermined the "integrity of the judicial process."  *Id.* at 245-46.  The Court set aside the ruling where the fraud perpetuated "a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society."  *Hazel-Atlas*, 322 U.S. at 246.

The Fourth Circuit has discussed the fraud on the court doctrine in additional depth.  The Fourth Circuit recently made clear that fraud on the court within the meaning of *Hazel-Atlas* "is not your 'garden-variety fraud.'" *Fox v. Elk Run Coal Co.*, 739 F.3d 131, 135 (4th Cir. 2014)

22

(quoting *George P. Reintjes Co. v. Riley Stoker Corp.*, 71 F.3d 44, 48 (1st Cir. 1995)).  Instead, it applies to situations "in which the integrity of the court and its ability to function impartially is directly impinged."  *Id.* at 136 (quoting *Great Coastal Express, Inc. v. International Brotherhood of Teamsters*, 675 F.2d 1349, 1356 (4th Cir. 1982)).  A party that alleges "ordinary" fraud as a basis for setting aside a final judgment typically must move for relief under Fed. R. Civ. P. 60(b)(3), which requires that a motion be filed within one year of the entry of the final judgment. *Id.*; *see also* Fed. R. Civ. P. 60(c)(1).  But, "as often happens with a rule, there is an exception." *Fox*, 739 F.3d at 135.  The "savings clause in Rule 60(d)(3) permits a court to exercise its inherent equitable powers to obviate a final judgment after one year for 'fraud on the court.'"  *Id.* at 135-36.  Rule 60(d)(3) fraud is the type of fraud with which *Hazel-Atlas* is concerned.

The government's conduct during these § 2255 proceedings meets the stringent standard for fraud on the court set forth in *Hazel-Atlas* and *Fox*.  In response to Mr. Higgs's very specific *Brady* claim, the government offered misrepresentations intended to cover up its own past misconduct and persuade this Court to uphold a death sentence.  That represents a "deliberately planned and carefully executed scheme" to defraud this Court.  The government was not faced merely with a vague allegation that they failed to turn over all available *Brady* evidence; it was faced with a highly specific claim that Victor Gloria was a suspect in a homicide in Baltimore, but was not charged due to his status as a federal witness and the intervention of the federal government.  It is now virtually certain that these allegations are accurate.  The government, knowing that the allegations were accurate, denied them in written pleadings.  Thus, the government's conduct caused a "subversion of the legal process . . . that we cannot necessarily expect to be exposed by the normal adversary process."  *Great Coastal*, 675 F.2d at 1357.

23

This gambit was successful.  The government's misrepresentations induced this Court to rule that Mr. Higgs's constitutional claim failed because "pure speculation about supposed benefits cannot substitute for hard facts," and because "Higgs, quite simply, has failed to demonstrate any causal connection between Gloria's testimony in this federal case and whatever treatment he may have received in the state jurisdictions."  *Higgs-3*, 711 F. Supp. 2d at 508.  It certainly is difficult to envision the Court making such rulings had it been presented with the arguments and evidence contained in this motion during the pendency of the § 2255 proceedings.  In other words, "[p]roof of the scheme, and of its complete success up to this date, is conclusive."  *Hazel-Atlas*, 322 U.S. at 246.[7]

The law of other circuits regarding the fraud on the court doctrine is both consistent with Fourth Circuit law and instructive here.  In an opinion joined by then-Judge Alito, the Third Circuit set forth a four-factor test for establishing fraud on the court.  In the Third Circuit's formulation, a Rule 60(d)(3) movant must establish: "(1) an intentional fraud; (2) by an officer of the court; (3) which is directed at the court itself; and (4) in fact deceives the court."  *Herring v.*

---

[7]In addition to holding that Mr. Higgs could not establish a causal connection between federal authorities and the decision not to prosecute Mr. Gloria for the murder, the Court also held that Mr. Higgs could not demonstrate prejudice.  *Higgs-3*, 711 F. Supp. 2d at 508-09.  The Court should revisit this determination as well, given that it was also influenced by the government's fraud.

At this juncture, the full extent of the government's misconduct is not yet known.  As noted above however, the government has conceded that it could not have prosecuted Mr. Higgs, let alone secured a conviction or death sentence, without the testimony of Mr. Gloria.  This Court agreed in that assessment, describing Mr. Gloria as the "critical link" in the conviction of Mr. Higgs.  Tr. 11/22/00 at 4.  If evidence demonstrating that the keystone witness literally got away with murder due to the intervention of the prosecution does not rise to the level of a reasonable probability of a different outcome, then *Giglio* is a dead letter.

Moreover, undersigned counsel have provided the information gleaned from the Baltimore Police file to trial counsel, who confirms that counsel would have used this information to impeach Mr. Gloria at trial.  Exhibit 32 (Affidavit/Declaration of Harry Trainor).

*United States*, 424 F.3d 384, 386 (3d Cir. 2005); *see also Demjanjuk v. Petrovsky*, 10 F.3d 338, 348 (6th Cir. 1993) (five-factor test requiring conduct: "1. On the part of an officer of the court; 2. That is directed to the 'judicial machinery' itself; 3. That is intentionally false, willfully blind to the truth, or is in reckless disregard for the truth; 4. That is a positive averment or is concealment when one is under a duty to disclose; 5. That deceives the court.").

Without specifically setting forth multi-factor tests, several other courts of appeals also require misdeeds on the part of an officer of the court to establish fraud within the meaning of *Hazel-Atlas*. *See*, *e.g.*, *Reintjes* 71 F.3d at 47-48 ("*Hazel-Atlas Glass* thus expanded the range of the fraud exception for untimely requests for relief . . . to include fraud committed by 'officers of the court'"); *Pumphrey v. Thompson Tool Co.*, 62 F.3d 1128, 1130 (9th Cir. 1995) ("one species of fraud upon the court occurs when an 'officer of the court' perpetrates fraud affecting the ability of the court of jury to impartially judge a case"); *Weese v. Schukman*, 98 F.3d 542, 553 (10th Cir. 1996) ("fraud on the court should embrace only that species of fraud which does or attempts to, subvert the integrity of the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication"); *Kerwit Med. Prods., Inc., v. N. & H. Instruments, Inc.*, 616 F.2d 833, 837 (11th Cir. 1980) (same).

The fraud at issue here thus meets both the Fourth Circuit's more general formulation and its sister circuits' more specific tests. During Mr. Higgs's § 2255 proceedings, (1) an Assistant United States Attorney; (2) made intentional misstatements; (3) directed to the Court itself; (4) that in fact deceived the Court in its adjudication of Mr. Higgs's claim.

Moreover, as in *Hazel-Atlas*, the government's misdeeds here "involve[d] far more than

25

an injury to a single litigant." *Hazel-Atlas*, 322 U.S. at 246.  First, the federal government's intrusion into the business of the Baltimore City State's Attorney's Office has affected numerous individuals involved with Mr. Creighton's murder.  The Baltimore Police, without the outside pressure applied to it by federal authorities, may well have come to the conclusion that Mr. Gloria was in fact the person who murdered Mr. Creighton.  As such, not only did Mr. Miller and the Scott twins unfairly take the blame for the killing, but Mr. Creighton's friends and family members were deprived of justice for their loved one.

More globally, however, the fraud here constitutes "a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society." *Hazel-Atlas*, 322 U.S. at 246.  The "United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935).  The United States Attorney "is in a peculiar and very definite sense the servant of the law." *Id.*  While "[s]he may strike hard blows, [s]he is not at liberty to strike foul ones." *Id.*

The attempt by an officer of the United States government to secure a citizen's execution by deception certainly "touch[es] on the public interest in a way that fraud between individual parties generally does not." *Fox*, 739 F.3d at 136.  As such, the "public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud," and the Court should remedy the injustice. *Hazel-Atlas*, 322 U.S. at 246.

**II.      THIS MOTION IS PROPERLY BROUGHT UNDER *HAZEL-ATLAS* AND RULE 60(D)(3); IT IS NOT SUBJECT TO THE "SECOND OR SUCCESSIVE" PETITION RESTRICTIONS OF 28 U.S.C. § 2244(B).**

In *Gonzalez v. Crosby*, 545 U.S. 524, 526 (2005), the Supreme Court granted certiorari to decide "whether, in a habeas case, [Rule 60] motions are subject to the additional restrictions that apply to 'second or successive' habeas corpus petitions under the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)."  After considering the relevant language of the Federal Rules of Civil Procedure and AEDPA, the Court held that some Rule 60 motions should be treated as "second or successive" habeas petitions under AEDPA, but others should not.  The Court concluded that "a Rule 60(b)(6) motion in a § 2254 case is not to be treated as a successive habeas petition if it does not assert, or reassert, claims of error in the movant's state conviction."  *Id.* at 538.[8]

The Court made plain that a Rule 60 motion that "attacks, not the substance of the federal court's resolution of a claim on the merits, but some defect in the integrity of the federal habeas proceedings," is not barred from review by the second or successive prohibition in AEDPA.  The Court specifically ruled that "[f]raud on the federal habeas court is one example of such a defect."  *Id.* at 532 n.5 (citing *Rodriguez v. Mitchell*, 252 F.3d 191, 199 (2d Cir. 2001) (a witness's allegedly fraudulent basis for refusing to appear at a federal habeas hearing "relate[d] to the integrity of the federal habeas proceeding, not to the integrity of the state criminal trial.")).

Here, the fraud being alleged represents a defect in the § 2255 proceedings themselves,

---

[8]The *Gonzalez* decision addressed only motions under Rule 60(b), rather than 60(d), and specifically noted that it was limiting its consideration to § 2254, rather than § 2255, cases. *Gonzalez*, 545 U.S. at 529 n.3.  It is thus unclear whether the decision impacts motions brought under *Hazel-Atlas* and Rule 60(d)(3) in a § 2255 case.  Mr. Higgs includes this discussion in the event that this Court should find that it does.

not in the substance of this Court's prior merits ruling.  As such, the fraud falls squarely within the ambit of footnote 5 in *Gonzalez*.  The Assistant United States Attorney's knowing misrepresentations in her habeas filings caused this Court to issue a § 2255 ruling based on inaccurate information.  *Gonzalez* therefore does not bar consideration of this motion.

## CONCLUSION AND PRAYER FOR RELIEF

As one prominent Court of Appeals judge recently observed in a case involving a *Brady* violation due to the government's failure to provide impeachment material regarding its star witness: "When a public official behaves with such casual disregard for his constitutional obligations and the rights of the accused, it erodes the public's trust in our justice system, and chips away at the foundational premises of the rule of law.  When such transgressions are acknowledged yet forgiven by the courts, we endorse and invite their repetition." *United States v. Olsen*, 737 F.3d 625, 632 (9th Cir. 2013) (Kozinski, C.J., dissenting from the denial of en banc review).

The government's conduct in this litigation was egregious.  It committed a serious *Brady* violation at trial by concealing devastating impeachment material regarding its star witness and then deliberately covered up the violation during post-conviction proceedings.  This is not an attenuated violation where one hand did not realize what the other was doing; where the prosecutor, for example, was not aware of the actions of some other law enforcement agency even though she had a duty to learn of them.  This is a case where *the trial prosecutor* spoke directly to *the person with the authority and inclination to charge her star witness with first degree murder* and talked him out of it.

When confronted with this allegation during § 2255 proceedings, she perpetrated a fraud on this Court.  She signed her name to two different documents, denying in each that any such machinations had taken place.  The fraud was successful, as these misrepresentations formed the basis for this Court's decision denying relief.

Mr. Higgs respectfully submits that the allegations and evidence contained in this motion

29

and the exhibits demonstrate his entitlement to relief.  At a minimum, however, he requests that

the Court grant him leave to fully uncover the extent of the government's misconduct and that

the Court provide the opportunity to present argument and evidence at a hearing on the matter.

WHEREFORE, Petitioner, Dustin Higgs, hereby requests that this Court:

A.     Direct the government to respond to this motion;

B.     Permit Petitioner to submit a reply to the government's response;

C.     Schedule oral argument and a hearing;

D.     Set aside the judgment in these proceedings under Fed. R. Civ. P. 60; and

E.     Grant all other and further relief that the Court might deem just, proper, and
       equitable.


Respectfully Submitted,


/s/ Matthew C. Lawry                          /s/ Stephen H. Sachs
Matthew C. Lawry                              Stephen H. Sachs
Federal Community Defender Office             WilmerHale LLP
    for the Eastern District of Pennsylvania  Five Roland Mews
Curtis Center, Suite 545-West                 Baltimore, MD 21210
601 Walnut Street                             (410) 532-8405
Philadelphia, PA 19106                        Steve.Sachs@wilmerhale.com
215-928-0520
Matthew_Lawry@fd.org


Dated: December 4, 2014

## CERTIFICATE OF SERVICE

I, Matthew C. Lawry, hereby certify that on this 4th day of December, 2014, I electronically filed the foregoing motion using the Court's CM/ECF system.  Electronic notice will be provided to the following individuals:

> Deborah A. Johnston
> Sandra Wilkinson
> Assistant United States Attorneys
> Office of the United States Attorney
> 6500 Cherrywood Lane, Suite 400
> Greenbelt, MD 20770-1249

/s/ Matthew C. Lawry
Matthew C. Lawry