# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA**, | * | |
| | * | |
| Respondent, | * | |
| | * | |
| v. | * | Crim. No. **PJM-98-0520** |
| | * | Civ. No. **PJM-05-3180** |
| | * | |
| **DUSTIN JOHN HIGGS,** | * | |
| | * | |
| Petitioner | * | |
| | * | |

## <u>MEMORANDUM OPINION</u>

Following Dustin John Higgs's conviction for the kidnapping and murder of Tanji Jackson, Tamika Black, and Mischann Chinn, a jury concluded that he should receive the death penalty. His conviction and sentence were affirmed on appeal. *See United States v. Higgs*, 353 F.3d 281 (4th Cir. 2003) *cert. denied*, 543 U.S. 999, 125 S. Ct. 627, 160 L.Ed.2d 456 (2004). The Court denied Higgs's Motion to Vacate Pursuant to 28 U.S.C. § 2255, *see United States v. Higgs*, 711 F. Supp. 2d 479 (D. Md. 2010). Two years later, Higgs filed his pending Motion for Relief pursuant to *Hazel-Atlas Glass Co. v. Hartford-Empire Co*., 322 U.S. 238 (1944) and Federal Rule of Civil Procedure 60(d). In his Motion, Higgs asks the Court to revisit his Motion to Vacate because he claims to have unearthed evidence from a police file that he says proves the U.S. Government committed fraud on the Court during the §2255 proceedings. ECF No. 579. He also asks the Court to order discovery. ECF No. 580. Because the Court agrees with the Government that Higgs has failed to establish even colorable fraud on the Court, his Motions are **DENIED**.

# I.

## Background

The Court need not recite all the facts underlying Higgs's conviction, but to the extent it is helpful for understanding Higgs's pending motion, the following summary will be helpful.

On the evening of January 26, 1996 Higgs, Willis Haynes, and Victor Gloria drove from Higgs's apartment in Laurel, Maryland, to Washington, D.C. Once there, they arranged for Tanji Jackson, Tamika Black, and Mischann Chinn and to join them at Higgs's apartment to drink alcohol and listen to music. In the early hours of next morning, Higgs and Jackson began arguing, prompting Jackson to grab a knife from the kitchen. Haynes persuaded Jackson to drop the knife but Jackson remained angry and all three women, upset, left the apartment on foot. As Jackson left, she supposedly made some sort of threat against the men, which angered Higgs.

Shortly after the women left, Higgs grabbed his coat and a silver .38 caliber handgun and urged Haynes and Gloria to come with him to catch up with the women. Higgs, Haynes and Gloria then got into Higgs's car and, with Higgs driving, Haynes in the front passenger seat, and Gloria behind Higgs in the back seat, pursued the three women. Not far from Higgs's apartment they caught up with them and ordered them into the car, drove into the Patuxent National Wildlife Refuge, a federal property within the jurisdiction of the United States, and pulled over at a secluded spot. One of the young women asked if they were trying to "make [them] walk from there," to which Higgs responded, "Something like that." The women then got out of the car.

Higgs meanwhile handed his gun to Haynes, who put it behind his back and got out of the car. Moments later, Gloria, who remained in the back seat of the car, heard a gunshot and wiped the mist off the back window in time to see Haynes shoot one of the women in the chest. Gloria

turned to ask Higgs what he was doing, and saw Higgs holding the steering wheel, watching the shootings in the rearview mirror. Gloria, still in the back seat, put his head down and heard more shots and the sound of women screaming. The three men then drove away, leaving the women, all of whom had apparently been shot, at the secluded spot.

Afterwards, the three men drove to the Anacostia River and threw the guns in, then drove back to Higgs's apartment to clean the place of evidence. Higgs and Haynes left Gloria with a warning to "keep [his] mouth shut." Around 4:30 am, a driver found the dead women's bodies strewn along Maryland Route 197, which runs through the Patuxent National Wildlife Refuge. At the scene, Park Police found Jackson's day planner, which contained Higgs's nickname and telephone number, as well as a note of the street number of his apartment and the license plate number for his car.

On December 21, 1998 Higgs and Haynes were indicted on three counts each of first-degree premeditated murder, *see* 18 U.S.C.A. § 1111(a), first-degree murder committed in the perpetration or attempted perpetration of a kidnapping, *see id.*, kidnapping resulting in death, *see* 18 U.S.C.A. § 1201(a)(2), and using a firearm while committing a crime of violence, *see* 18 U.S.C. § 924(c). Haynes was tried first. On August 24, 2000, after finding him guilty on all three counts in the guilt phase, the jury failed to reach a unanimous verdict on the death sentence in the penalty phase. The Court thereafter sentenced Haynes to concurrent life terms on the first-degree murder and kidnapping counts and forty-five years consecutive on the firearm offenses.

At Higgs's separate trial, which began five weeks later, a different jury returned guilty verdicts on all counts. Gloria's eyewitness testimony about the night of the murders was unquestionably significant to the jury's deliberations. At the guilt phase of the trial, Gloria told the jury, among other things, that following the argument with Jackson, Higgs wanted to have

the victims killed; that he (Gloria) rode in the back seat of Higgs's car; and that he saw Higgs hand a gun to Haynes while whispering something to Haynes. During cross-examination, Higgs's counsel attacked Gloria's credibility, highlighting his criminal past, including his use and sale of drugs and his violation of probation, previous false statements he made to police investigating the murders, as well as his willingness to lie to authorities in general. The jury also heard that Gloria faced 15 years in prison for his involvement in the triple homicide, as well as over 30 years in jail for unrelated federal and state drug charges, and that in exchange for his cooperation in the Higgs case, the Government had agreed to seek a lighter sentence for Gloria for his role in the homicides.[1]

On October 26, in the penalty phase of his case, the jury determined that Higgs should receive the death penalty on each of the murder and kidnapping charges. The Court entered judgment on the jury's verdict and Higgs appealed to the United States Court of Appeals for the Fourth Circuit, which affirmed both the conviction and sentence. *See United States v. Higgs*, 353 F.3d 281 (4th Cir. 2003) ("*Higgs I*"). The Supreme Court denied Higgs's petition for writ of certiorari. *Higgs v. United States*, 543 U.S. 99, 125 S. Ct. 627, 160 L.Ed.2d 456 (2004). While his appeal was pending, Higgs filed a Motion for a New Trial, which this Court denied, and the Fourth Circuit affirmed. See *United States v. Higgs*, 95 Fed. Appx. 37 (4th Cir. 2004), *cert. denied*, *Higgs v. United States*, 543 U.S. 1004, 125 S. Ct. 608, 160 L.Ed.2d 465 (2004) ("*Higgs II*").

---

[1] On November 22, 2000, the Court sentenced Gloria to 84 months in prison for his role in the *Higgs/Haynes* murders, followed by three years of supervised release.

**The § 2255 Proceedings**

On November 28, 2005, Higgs filed a 122-page Motion to Vacate under 28 U.S.C. § 2255 or in the Alternative Pursuant to 28 U.S.C. § 2241 asserting twenty-five claims of error.[2] The only claim relevant to the motion presently before the Court was Higgs's allegation that the Government had failed to turn over all the material relating to Gloria that it was required to under *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny. Pet.'s Mot. Vacate § 2255, ECF No. 492. While preparing the § 2255 Motion, defense counsel claim to have learned Gloria had been a suspect in the 1998 killing of one Martrelle Creighton, who was stabbed during a fight in the Baltimore Inner Harbor. In his Motion, Higgs alleged that Gloria was not charged with this murder at the behest of the Government in *Higgs* "in an effort to preserve his status as a testifying witness in [the] federal capital triple homicide case," and that the Government's failure to disclose this consideration violated Higgs's due process rights. Pet.'s Mot. Vacate § 2255 at 33, ECF No. 492. Had the Government disclosed this alleged understanding, Higgs argued, defense counsel would have used it to further impeach Gloria as a witness, which would have had a material effect on the outcome of his trial. *Id.*

In response, the Government described Higgs's claims as "speculation about the Government's knowledge or actions," arguing that "vague descriptions of the supposed benefits conferred on Gloria largely fail to demonstrate any connection to this trial and federal officials." Govt.'s Resp. Mot. Vacate § 2255 at 88, ECF No. 520. The Government further argued that "[c]ertainly, the Constitution required the prosecutors to disclose any consideration promised to Gloria in exchange for his testimony" but that prosecutors "had no duty or ability to predict,

---

[2] Higgs also sought discovery on various issues raised in his petition, which the court denied. *See* ECF Nos. 509, 548.

much less inform Higgs of the benefits, or acts of grace, that coincidentally flowed to the witness after this trial." *Id*. at 86. In response to Higgs's discovery request, the Government said "there is no evidence that [Gloria] was promised anything other than that which he admitted at trial." Govt.'s Resp. Mot. Disc. at 5, ECF No. 513.

The Court agreed with the Government and denied Higgs's motion in all respects, including the alleged *Brady* violations regarding Gloria. *See Higgs v. United States*, 711 F. Supp. 2d 479 (D. Md. 2010) ("*Higgs III*"). Specifically, addressing Higgs's claim that Gloria was spared a murder charge in Baltimore in exchange for his cooperation in the federal trial, the Court held:

> Again, pure speculation about supposed benefits cannot substitute for hard facts. See *Roane*, 378 F.3d at 401. Higgs, quite simply, has failed to demonstrate any causal connection between Gloria's testimony in this federal case and whatever treatment he may have received in the state jurisdictions.
>
> Even were the Court to find that the prosecution failed to turn over any of this evidence, and again assuming the factual accuracy of the supposed benefits, Higgs has not demonstrated its materiality. Gloria's credibility as a witness was thoroughly explored and impugned by Higgs' counsel through vigorous cross-examination. Gloria openly confessed to an extensive criminal history, going so far as to state that "if it is going to help Victor Gloria, Victor Gloria will do whatever he has to do." Unquestionably counsel established that Gloria was a witness of dubious reliability, whose testimony the jury could weigh accordingly. In other words, any evidence that Gloria may have received consideration for his testimony beyond that disclosed by the Government could not have further undermined his already low credibility, nor would it have created a "reasonable probability" of a more favorable verdict.

*Higgs III*, 711 F. Supp. 2d at 508.

The Court denied Higgs's motion for a certificate of appealability and his motion for reconsideration. ECF Nos. 560, 561. Higgs sought leave to appeal from the Fourth Circuit, which granted the certificate of appealability but only as to one issue unrelated to Higgs's present motion. On November 23, 2011, the Fourth Circuit denied Higgs's appeal. *United States v.*

*Higgs*, 663 F.3d 726 (4th Cir. 2011). On December 10, 2012, the U.S. Supreme Court denied

Higgs's petition for a writ of certiorari. *Higgs v. United States*, 663 F.3d 726, 133 S. Ct. 787, 184

L.Ed.2d 583 (2012).


### The Creighton Murder Investigation

Meanwhile, Higgs's defense counsel continued to investigate Gloria's potential

involvement in the Creighton murder and sought access to the investigation file of the Baltimore

Police Department (BPD). Pet's Mot. Relief R. 60(d) "R.60(d) Mot." at 19, ECF No. 579. After

some back and forth, Higgs obtained the complete file in the spring of 2012. *Id.*

Because Higgs and the Government differ sharply as to the interpretation of the facts

contained in the police file, what follows is a summary of the facts upon which they appear to

agree or which appear on the face of the exhibits.

On July 18, 1998, over two years after the *Higgs/Haynes* murders and two-and-a-half

months before Gloria was arrested in connection with that case, a man named Martrelle

Creighton was killed in the Inner Harbor area of Baltimore by a single stab wound to the neck.

R.60(d) Mot., Ex. 2 at 1, ECF No. 579-1.

Baltimore Police soon learned that Creighton had died during an argument between two

groups of young men over a group of young women. *Id.* at 3. One of the groups of men consisted

of Creighton and his friends Clarence White and David Bishop. *Id.* The other group comprised

Kevin Miller, twin brothers Kevin and Keith Scott, and Victor Gloria. Witnesses described all

four men in Miller's group as African-American, or multi-racial – in Gloria's case, half African-

American half Puerto Rican. *See* R.60(d) Mot., Ex. 8 at 7, ECF No. 579-1.Various witnesses

described Gloria as well as the Scott twins as "light skinned", and Miller as "brown skinned" or

"dark skinned." R.60(d) Mot., Ex. 6 at 3, Ex. 8 at 7-8, 10, ECF No. 579-1. Miller was described as around six-feet tall; Gloria was described variously as between 5'7" and six feet. R.60(d) Mot., Ex. 2 at 4, Ex. 10 at 12, Ex. 11 at 8, ECF No. 579-1.

The trouble in the Inner Harbor began when Creighton's group attempted to strike up conversation with a group of three young women, which consisted of sisters Barbara and Charnetta Bailey, and their friend Erica Jones. R.60(d) Mot., Ex. 9 at 1, Ex. 10 at 2, ECF No. 579-1. The women, who knew nobody in Creighton's group, were not interested. *Id.* Shortly thereafter, the women began talking with Gloria's group, whom they also had not known previously. *Id.* Creighton apparently became angry that the young women were talking to members of Gloria's group given that they had no interest in talking to Creighton's group. *Id.* As a result, Creighton began yelling at the women and Gloria's group. *See* R.60(d) Mot., Ex. 6 at 2, ECF No. 579-1.

An altercation ensued. Someone in Gloria's group punched Creighton in the neck, apparently with a knife or sharp object of some kind, striking Creighton's carotid artery. More punches may or may not have been thrown; other people may have fought one another; members of Gloria's group ran away shortly thereafter and Creighton soon died of his wound.

The Baltimore Police Department ("BPD") began to investigate, interviewing White and Bishop (the victim's friends) on the night of the shooting. Handwritten notes in the police file indicate that White described how, once the altercation began, a man with "light skin" swung at Creighton, at which point Creighton "grabbed his neck and was bleeding bad." R.60(d) Mot., Ex. 5 at 2, ECF No. 579-1. In contrast, Bishop, in a taped interview hours after the killing, told how a 5'11" man with "dark skin" punched Creighton in the neck, and a man with "light skin" punched him in the head. R.60(d) Mot., Ex. 7 at 1-2, ECF No. 579-1.

About a week later, on July 29, BPD Detective Robert Patton interviewed Barbara Bailey. From her conversations with the two groups of men, Bailey knew their first names. R.60(d) Mot, Ex. 8 at 2, ECF No. 579-1. Bailey said that before the altercation took place, Gloria in fact ran away. *Id*. at 3. She said she was walking away from the group but turned around when the men began fighting and saw Miller, whom she described as dark skinned, punch the victim. *Id*. at 3-4. She did not realize that the victim had been stabbed, but said she did see blood all over his shirt. *Id*. at 4.

On August 12, Detective Patton interviewed Charnetta Bailey. She also said that before the victim was stabbed, Gloria had run off. R.60(d) Mot., Ex. 9 at 3, ECF No. 579-1. She indicated that she saw Miller and the victim circling each other as if they were going to fight but turned around before any punches were thrown. *Id*. She said she turned back and saw blood, and described how Miller then boasted of having beaten Creighton. *Id*. She, too, did not realize the victim had been stabbed. *Id*. at 5.

In mid-November, the BPD showed a photographic line-up to Bishop and the Bailey sisters, all of whom identified the Scott twins as part of Gloria's group. Govt.'s Resp. R. 60(d) Mot. ("Govt.'s Resp."), Ex. 5 at 1, Ex. 6 at 1, ECF Nos. 585-5, 585-6. The BPD arrested the Scott twins on February 2, 1999. R.60(d) Mot., Ex. 3 at 2, ECF No. 579-1.

The Scott twins both stated that it was Gloria who stabbed Creighton, although they, too, did not initially realize that Creighton had been stabbed. R.60(d) Mot., Ex. 10 at 7-10, Ex. 11 at 4-7, 11, ECF No. 579-1. The Scott twins both said that Creighton approached Miller as though he was going to throw a punch, at which point Gloria punched Creighton in the neck and then ran away. R.60(d) Mot., Ex. 10 at 7-10, Ex. 11 at 4-7, 11, ECF No. 579-1. Both said neither they nor Miller exchanged blows with Creighton. *Id.* The Scott twins also indicated that they knew

from the news that he knew Gloria at that time had been incarcerated in connection with the murder of three women in Prince George's County. R.60(d) Mot., Ex. 10 at 11, Ex. 11 at 11, ECF No. 579-1. Keith Scott further indicated that Gloria had been arrested with Willis Haynes, whom Keith knew. R.60(d) Mot., Ex. 10 at 11-12, ECF No. 579-1.

At some point in their investigation, the BPD began discussing the case with federal authorities involved in the *Higgs/Haynes* Murder investigation and trial. The BPD file contains a handwritten note dated February, 2, 1999 – the same day the Scott twins identified Gloria as Creighton's killer. That note listed the names of Detectives Rydi Abt and Joseph Green of the United States Park Police, along with Detective Green's office and pager numbers. R.60(d) Mot., Ex. 14, ECF No. 579-1. It also lists the number for the Park Police Criminal Investigations Bureau. *Id.* Immediately under the names and telephone numbers was the following notation: "Jan '96 – 3/B/F victims shot to death on BW Pkwy." *Id.* Under that notation is the notation "Dec '98 – 3 arrest made," followed by the names of Haynes, Higgs and Gloria, along with other identifying information. *Id.*

On that date, February 2, 1999, Detective Green retrieved a photographic line-up previously created by the Park Police, which included pictures of Gloria, and provided it to the Baltimore Police. R.60(d) Mot., Ex. 15, ECF No. 579-1. The police file also contained a complaint dated September 9, 1996 in which the complainant alleged that Gloria had thrown a rock at his face and pulled a knife on him outside an Applebee's restaurant in College Park, MD. R.60(d) Mot., Ex. 14, ECF No. 579-1.

The police file also contained a handwritten note dated February 10, 1999, which included the notation: "Case Agent for Victor Gloria S/A Brad Shaefe FBI Calverton Office." R.60(d) Mot., Ex. 16, ECF No. 579-1. Several additional, undated, handwritten notes contained

the names of Detectives Green and Abt, along with telephone numbers and information relating to the *Higgs/Haynes* Murders. *Id.*; R.60(d) Mot., Ex. 17, Ex. 18, ECF No. 579-1. One such note contained directions to the U.S. Park Police Headquarters. R.60(d) Mot., Ex. 20, ECF No. 579-1.

On March 19, 1999, Detective Patton showed Barbara and Charnetta Bailey photographic line-ups of Gloria and Miller. Barbara Bailey could not identify either man. Govt.'s Resp., Ex. 12 at 1, ECF No. 585-12. Charnetta Bailey identified Miller but not Gloria. Govt.'s Resp., Ex. 13 at 1. As for Miller, Charnetta Bailey identified him as one of four suspects involved in the homicide.[3] *Id.*

On April 7, 1999, the BPD arrested Miller. R. 60(d) Mot., Ex. 12 at 1, ECF No. 579-1. Although some details of his testimony differed from that of the Scott twins, Miller also said that Gloria punched Creighton and then ran away. *Id.* at 5-6. Miller said that he himself then threw a punch at one of Creighton's friends, but never hit Creighton. *Id.* Miller denied stabbing Creighton and said he did not realize when he began fighting that Creighton had been stabbed, and that it was only when the Scott twins called him after their arrest and "told him everything" that he learned about the stabbing. *Id* at 6. Miller told Detective Patton that he had talked with the Scotts at least three times since they were arrested because they wanted him to "be their witness" and give them some "lawyer money." *Id.* at 15. Miller also said he received a letter from the Scotts while they were in jail, and talked to their girlfriends. *Id.* at 16. He said he talked with the Scotts about the case over the phone, and described how "their girlfriends told me everything about their statements and stuff." *Id.*

---

[3] In its brief, the Government quotes Charnetta Bailey as saying, presumably at the photographic line-up interview, in reference to Miller: "[H]e looks like the guy who may have had the knife." Govt.'s Resp. at 14-15, ECF No. 585. However, the exhibit to which the Government cites (Govt. Ex. 13) contains no such quote. Nor can the Court find it in any other exhibit parties have provided.

The BPD file also contained a handwritten note dated one week later, August 14, 1999, the author of which was Mark Cohen, then chief homicide prosecutor in the Baltimore City State's Attorney's Office[4]. The note read as follows:

> Bobby,
>
> > Re Victor Gloria
>
> 1 I spoke to AUSA Deborah Johnston concerning Victor Gloria on 4/12/99. She told me that Gloria pled guilty to AAF in triple murder case + that his plea agreement is sealed. The two Co-[Defendants] Willis Haynes + Dustin Higgs have trial date of 2-7-2000. Because plea agreement is sealed, she could not tell me if Gloria is going to testify agt. Co-[Defendant].
>
> 2 AUSA Johnston states that it is possible that Co-[Defendants] – Scott, Scott + Miller are blaming Gloria because they are friends of [Defendants] in her case especially Haynes. She suggested we talk to
>
> > (1) Joe Green Park Police B - [phone number]
> >
> > (2) Brad Sheafe - FBI B - [phone number]
> >
> > - They could give us background on case
>
> 3 After we talk to these officers, we will decide on next course of action, that is, either writ Gloria + charge him or talk to his lawyer about the case.
>
> 4 Please call me
>
> Mark Cohen

R.60(d) Mot., Ex. 21 at 1, ECF No. 579-1.

Further, the BPD file contained a progress report dated April 21, 1999 prepared by Detectives Patton and Kirk Hastings, addressed to the commanding officer of the Homicide Unit. Like the Cohen note, it indicated contact between state and federal authorities regarding the Creighton murder investigation. The report read as follows:

---

[4] It is unclear exactly from the record to whom this note was addressed. But given that it was found in the BPD's investigative file and was addressed to "Bobby," quite probably it was meant for Robert Patton, the lead BPD detective on the Creighton case.

In reference to the captioned investigation four individuals have been identified as being involved in the captioned murder. Three of the suspects, Kevin Scott, Keith Scott and Kevin Anthony Miller have since been arrested and are currently being held without bail at C.B.l.F.

The Fourth suspect, Victor Gloria is currently in Federal custody and is being held in reference to a 1996 triple Homicide that occurred on the Baltimore Washington Parkway. Per the U.S. Attorney's office Victor Gloria had plead guilty and is slatted [sic] to testify against his co-defendants, Willis Haymes [sic] and Dustin Higgs who are reportedly are [sic] close friends with the Scott brothers and Kevin Miller.

Your Investigator will note that when the Scott brothers and Kevin Miller were interviewed at the Homicide office all three implicated Victor Gloria stating that Gloria was the only person who had engaged the victim in physical altercation. All three stated that Victor Glory [sic] punched the victim once in the face or neck. All three stated that Victor Gloria was not armed with any type of knife or weapon when they witnessed the altercation.

The Scott brothers along with Kevin Miller stated that after Victor Gloria punched the victim he immediately ran from the area. Your Investigator will note further and in reference the statements of the Kevin Miller and the Scott brothers. Your Investigator noticed that their statements are very similar in nature and appeared to have been rehearsed.

This assumption was supported when Kevin Miller stated during his initial interview that the Scott brothers called him from Jail several times and advised him that your Investigators were looking for him and that he would probably be arrested and charged with Murder.

The U.S. Attorney's Office was advised by A.S.A Cohen that Kevin Miller and the Scott brothers had implicated Victor Gloria In the captioned Homicide. The U.S. Attorney reported that during course of their Investigation they received information that the Scott brothers and Kevin Miller were close friends with Victor Gloria's co-defendant, Willis Haymes [sic] and Dustin Higgs and were aware that Victor Gloria was a Federal witnesses and planed [sic] to testify against Hymes [sic] and Higgs. The U.S. Attorney believes that the implication of Victor Gloria by Kevin Miller and the Scott brothers is their form of retaliation against Gloria,

Your Investigators along A.S.A Cohen believes that the A.U.S.A. is on track with their assumption. Your Investigators support is based on eyewitness information that Victor Gloria ran from the scene prior to the stabbing. The eyewitnesses identified Kevin Anthony Miller via photographic line up as the stabber and the only person seen engaging the victim in physical altercation.

In an effort to finally discern who of the four listed suspects actually stabbed the victim. Your investigator in concert with A.S.A. Cohen believe by aggressively re-interviewing the Scott brothers we could ultimately convince them to tell the complete truth. This would clear up the apparent inconsistencies in their statements and ultimately discern from them who the actual stabber was which would corroborate the other eyewitnesses.

In addition A.S.A Cohen indicated that if the Scott brothers cooperated and changed their statements and clear up the inconsistencies he wanted to administer a C.V.S.A. examination to verify their new statements. Your investigator ultimately spoke with Detective J.T. Brown and tentatively scheduled the examinations for the 21st of April 1999 and obtained the writs for the same date.

On the 21st of April 1999 your Investigator In concert with Detective John Thanner transported Keith Scott and Kevin Scott from the Baltimore City Detention Center to the Homicide office for re-interview. Once at the Homicide office the Scott brothers were placed in separate interview rooms and advised of their rights. Both refused to waive their rights and staled that their attorney's [sic] told them not to talk to the Police and to stand by their original statements.

Your Investigators explained in detail the circumstances surrounding the re-interview and the need for them to clear up the apparent inconsistent information that they initially provided in their original statements. Both brothers ultimately refused to cooperate and indicated that they were going to stand by their original statements and further refused to submit to a C.V.S.A. examination.

Your Investigators will note that the interview at this point had to be terminated and no new information was gleaned. Your Investigator at this point transported the Scott brothers back to B.C.D.C. and notified A.S.A. Cohen of the aforementioned results.

R.60(d) Mot., Ex. 22 at 1-2, ECF No. 579-1.

On June 8, 1999, over a month after Detective Patton wrote his report, the BPD showed Bishop (Creighton's friend who was with him the night of the murder) photographic line-ups. Bishop identified Miller as the person who stabbed the victim. Govt.'s Resp., Ex. 17 at 1, ECF No. 585-17. He did not identify Gloria. Govt.'s Resp., Ex. 18, ECF No. 585-18.

Then, on June 11, 1999, the BPD showed White (who also was Creighton's friend and with him the night of the murder) photographic line-ups of Miller, Gloria and the Scott twins.

Govt.'s Resp., Ex. 19 at 1, ECF No. 585-19. White also identified Miller, who he said "looks like the person who stabbed" the victim. R.60(d) Mot., Ex. 6 at 5, ECF No. 579-1. White did not identify Gloria. Govt.'s Resp., Ex. 21 at 1, ECF No. 585-21. White also identified Kevin and Keith Scott as having been present when the murder occurred. Govt.'s Resp., Ex. 20 at 1-2, ECF No. 585-20. When the BPD interviewed White on the night of the murder (about a year before this line-up), he had described the man who had swung at Creighton as having "light skin." But in an interview apparently simultaneous with the line-up, White – at that point 16 years old – described the assailant as having dark skin. R.60(d) Mot., Ex. 6 at 1-3, ECF No. 579-1.

Five days later, the BPD re-interviewed the Scott twins and administered a polygraph examination, which both twins "failed." The BPD file contains a report written by Detective Patton that same day addressed to the commanding officer. It read in part:

> On the 16th of June 1999 at 0900 hours and in furtherance of the captioned investigation. Your Investigators obtained the appropriate legal documents and transported Keith and Kevin Scott from the Baltimore City Detention Center to the Homicide office. Your Investigators planed [sic] to initiate a marathon interrogation initiative and administer polygraph examination on both suspects.

> Your Investigators will note that the Scott brothers in concert with Kevin Anthony Miller have conspired together and have given statement implicating Victor Gloria. Your Investigators will note that three independent eyewitnesses have since positively identified Kevin Anthony Miller as the individual who stabbed the above victim.

> Those same witnesses are shown photographic arrays, which contained photographs of Victor Gloria and are unable to make an identification and in their statements they made no reference to Victor Gloria. Prior to the polygraph examination your investigators interviewed the Scott brothers in an effort to determine if there was any changes in their original statements.

> Your Investigators ultimately found that both suspects continue to maintain that Victor Gloria was the stabber and was the only person who engaged the victim in altercation. At this point we initiated the polygraph examination starting with Keith Scott. Keith Scott was then moved to the polygraph examination room where Detective J.T. Brown initiated the polygraph examination.

Your Investigators will note that while Keith was taking the polygraph examination your Investigators continued the interrogation of Kevin Scott. After an extensive examination Det. Brown reported that Keith Scott was given the examination a total of three times and ultimately failed all three examinations. At this point, Kevin Scott was then taken to the polygraph examination room and Keith Scott was moved back to the Homicide office.

In reference to Kevin Scott he was ultimately given the same number of examinations and also failed each examination. Your Investigators will note that while Kevin Scott was in the polygraph room your Investigators continued the interrogation of Keith Scott and were ultimately unable to rehabilitate him. Kevin Scott was ultimately moved back to the Homicide office where your investigators continued the interrogation that ultimately yielded the same results. Your investigators will note that the entire process encompassed several hours of comprehensive interrogation and interview, which ultimately had negative results. At conclusion the Scott brothers were transported back to B.C.D.C. with their conspiracy intact.

A month or so later, on July 18, 1999, the Scott twins and Miller were indicted on charges of first-degree murder. R.60(d) Mot., Ex. 23 at 1, Ex. 24 at 1, ECF No. 579-1. On August 30, 1999, the Scott twins pleaded guilty to second-degree assault, and were sentenced to time served (about seven months). R.60(d) Mot., Ex. 25 at 1, Ex. 26 at 1, ECF No. 579-1.

Miller pleaded guilty in state court to second-degree murder on October 18, 1999, and received a sentence of twenty years with all but five years suspended. R.60(d) Mot., Ex. 27 at 1, ECF No. 579-1. This five-year sentence was made concurrent to any other sentence, with credit for time served. R.60(d) Mot., Ex. 28 at 1, ECF No. 579-1. Miller was also given three years of probation upon release. *Id.* The judge who sentenced Miller, Judge William Quarles (then a judge for the Circuit Court for Baltimore City and later of the U.S. District Court for the District of Maryland) explained his departure from the state guideline range in the following terms: "[M]uddled factual statement leaves few things clear: someone died and the Def. was involved." *Id.* Miller did not serve his full five-year term; he was released from prison in July 2002, three years and three months after he was first arrested. R.60(d) Mot., Ex. 30 at 1, ECF No. 579.

Nothing in the BPD file indicates that Gloria was ever charged in connection with Creighton's murder, or that BPD investigators spoke with Gloria at any point during their investigation, or that the investigators made any sort of arrangement with the AUSA not to charge Gloria as part of an overall deal to get Gloria to testify against Higgs in the present case.

## II.

### The Pending 60(d) Motion

Based on this allegedly newly discovered evidence, Higgs has filed a Motion for Relief from Final Judgment Pursuant to *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944), and Federal Rule of Civil Procedure 60(d), asking the Court to set aside its decision denying his Motion to Vacate pursuant to § 2255 because of alleged "fraud on the court."[5] R.60(d) Mot., ECF No. 579. He also filed a Renewed Motion for Production of Exculpatory Evidence and Renewed Motion for Discovery. Pet.'s Mot. Disc., ECF No. 580.

Higgs argues that the Government, through AUSA Johnston, made fraudulent assertions to the Court in its Response in Opposition to his Motion to Vacate regarding the extent of the connection between the federal murder investigation involving Gloria and the BPD's murder investigation. Specifically, Higgs alleges the Government committed fraud on the court by

---

[5] Higgs argues, and the Government does not dispute, that his motion is not barred by the prohibition on "second or successive" § 2255 petitions absent appellate court permission. *See* 28 U.S.C. § 2255(h). In support, he cites the Supreme Court's decision in *Gonzalez v. Crosby*, 545 U.S. 524 (2005), which held that if a Rule 60(b) motion "attacks . . . the integrity of the federal habeas proceedings," rather than the outcome of those proceedings, it is not a habeas corpus application and does not require pre-filing authorization. *See id.* at 532 ."[F]raud on the federal habeas court," the Supreme Court suggested, would be an example of a defect in the integrity of proceedings. *Gonzalez*, 545 U.S. at 532 n.5; *see also United States v. Williams*, 790 F.3d 1059, 1088 n.11 (10th Cir. 2015) (suggesting ADEPA does not limit court's power to correct fraud on initial habeas court because, in such a case, "the petitioner may not have had a fair opportunity to challenge the merits of his conviction in the first habeas proceeding"). *Gonzalez* specifically limited its discussion to § 2254 cases, and not § 2255 cases such as the one before the court. However, the Fourth Circuit has applied *Gonzalez* to Rule 60 petitions seeking to reopen § 2255 proceedings. *See United States v. McRae*, 793 F.3d 392, 397 (4th Cir. 2015). Given that *Gonzalez* applies to § 2255 in this Circuit, and that Higgs's Motion ostensibly attacks the integrity of the § 2255 proceedings (because he alleges misrepresentation by an officer of the court) the Court agrees with Higgs that his Motion is not barred by the "second or successive" rule.

denying that federal officials knew about or had any influence with respect to benefits supposedly conferred on Gloria by the local authorities in Baltimore. R.60(d) Mot. at 2. In other words, Higgs claims, the Government knew his allegation that Gloria avoided murder charges in exchange for his testimony was supported by hard facts, but "made false representations to this Court during the § 2255 litigation in order to prevail." *Id*. at 2-3, 24. Higgs argues the Government's alleged misrepresentations "induced the Court to rule that Higgs's constitutional claim failed," and that it is "difficult to envision the Court making such rulings had it been presented with the arguments and evidence contained in this motion during the pendency of the § 2255." *Id.* at 24.

The Government responds that Higgs has failed to show fraud on the court, Govt.'s Resp. R.60(d) Mot. ("Govt.'s Resp.") at 20-24, ECF No. 585, arguing as follows: The evidence contained in the BPD's investigation file most likely shows the BPD did not charge Gloria because the BPD did not believe he was guilty; consequently Higgs has failed to prove Gloria was not charged for the Creighton murder in consideration of his testimony in the *Higgs/Haynes* murder trial. If Higgs cannot prove there was consideration to Gloria, Higgs also fails to prove that the Government's denial of that consideration during the § 2255 proceedings was in any way false or misleading. And if there is no misrepresentation to the Court by the Government, the Government argues, there was no fraud on the court as Higgs alleges. *See id*. The Government also attacks Higgs for allegedly failing to prove by clear and convincing evidence that the Government employed a "deliberately planned and carefully executed scheme" to defraud the Court. *Id*. at 24-25. Moreover, the Government argues, even if Higgs has proved a deliberate plot to mislead the Court – which the Government vigorously denies – he has not shown that the alleged deception was material to the Court's ruling on his § 2255 Motion. *Id*. at 26.

# III.

## Rule 60(d)

The bar Higgs has set himself in bringing a motion under Federal Rule of Civil Procedure 60(d) is a high one. *See Fox v. Elk Run Coal Co.*, 739 F.3d 131, 136-37 (4th Cir. 2014). Ordinarily when a party believes its opponent has obtained a court ruling by fraud or misrepresentation, it may move for relief under Federal Rule of Civil Procedure 60(b)(3) within one year of the judgment. *See* Fed R. Civ. P. 60(b)(3), (c). This one year limit "balances the competing interests of relieving an aggrieved party from the hardships of an unjustly procured decision against the deep 'respect for the finality of judgments . . . engrained in our legal system.'" *Fox*, 739 F.3d at 135 (alteration in original) (quoting *Great Coastal Express, Inc. v. Int'l Bhd. of Teamsters*, 675 F.2d 1349, 1354-55 (4th Cir. 1982)). But "as often happens with a rule, there is an exception," *Fox*, 739 F.3d at 135. Accordingly, under Rule 60(d̲), a court is empowered to "set aside a judgment for fraud on the court" after more than one year has passed. Fed. R. Civ. P. 60(d)(3). However, because fraud on the court is a "nebulous concept" it "should be construed very narrowly" lest it swallow Rule 60(b̲)(3) entirely. *Fox*, 739 F.3d at 136 (citing *Great Coastal*, 675 F.2d at 1356).

Fraud on the court is therefore "not your garden-variety fraud." *Fox*, 739 F.3d at 135 (internal quotation marks and citations omitted). It is confined to "the most egregious cases," such as "bribery of a judge or juror, or improper influence exerted on the court by an attorney, in which the integrity of the court and its ability to function impartially is directly impinged." *Great Coastal*, 675 F.2d at 1536; *see also Cleveland Demolition Co. v. Azcon Scrap Corp.*, 827 F.2d 984, 986 (4th Cir. 1987) (indicating that fraud on the court involves "corruption of the judicial process itself" (quoting *In re Whitney-Forbes*, 770 F.2d 692, 698 (7th Cir. 1985))). Fraud on the

court requires an "intentional plot to deceive the judiciary," and must "touch on the public interest in a way that fraud between individual parties generally does not." *Fox*, 739 F.3d at 136.

The Fourth Circuit has held that a petitioner must also establish that the fraud was material to the disposition of the proceedings he or she wants reopen in order to be entitled to relief. *United States v. MacDonald*, No. 97-7297, 1998 WL 637184, at *2 (4th Cir. Sept. 8, 1998) ("Our decision in *Great Coastal Express* requires that MacDonald at least establish that the fraud was material and deliberate."); *accord United States v. Estate of Stonehill*, 660 F.3d 415, 454 (9th Cir. 2011) (holding no fraud on the court because "[a]ny misrepresentations or false statements made by government witnesses or attorneys were on largely tangential issues and did not substantially undermine the judicial process by preventing the district court or this court from analyzing the case"); *Apotex Corp. v. Merck & Co.*, 507 F.3d 1357, 1360 (Fed. Cir. 2007) (holding fraud on the court requires "material subversion of the legal process").[6]

Lastly, to prevail on a Rule 60(d) motion, the petitioner must prove fraud on the court by "clear and convincing evidence." *See United States v. MacDonald*, No. 97-7297, 1998 WL 637184, at *2 (4th Cir. Sept. 8, 1998) (citing *Square Const. Co. v. Wash. Metro. Area Transit*

---

[6] That said, at least two Fourth Circuit panels prior to *MacDonald* held that a party seeking relief under Rule 60(b)(3) for fraud, misrepresentation, or misconduct need not show that newly obtained evidence would have altered the outcome of the final judgment. *Shultz v. Butcher*, 24 F.3d 626, 631 (4th Cir. 1994) (holding new evidence need not be "result altering" to entitle the petitioner to relief under Rule 60(b)(3) because the rule "focuses not on erroneous judgments as such, but on judgments which were unfairly procured." (quoting *Anderson v. Cryovac, Inc.*, 862 F.2d 910, 924 n.10 (1st Cir. 1988))); *Square Const. Co. v. Wash. Metro. Area Transit Auth.*, 657 F.2d 68, 72 (4th Cir. 1981) ("Setting aside a judgment under FRCP 60(b)(3) does not require that the material withheld be sufficient to alter the district court's judgment."). In contrast to both these cases, the defendant's motion in *MacDonald* was brought under a previous "savings clause" of Rule 60(b), which contained substantively identical language regarding fraud-on-the-court claims and was incorporated into Rule 60(d) in 2007. *See* Fed. R. Civ. P. 60(b) (1987) (amended 2007) (providing that "[t]his rule does not limit the power of the court . . . to set aside a judgment for fraud on the court"). Given that *MacDonald* came later in time and decided a motion, like this one, alleging fraud on the court, the Court follows *MacDonald* in holding that the petitioner must show materiality. This also seems more consistent with the strong policy in favor of finality of judgments, and the high bar defendants accordingly must meet to disturb a years-old final judgment under Rule 60(d). *See, e.g., United States v. Beggerly*, 524 U.S. 38, 47 (1998) (cautioning that independent actions under Rule 60 should be available "only to prevent a grave miscarriage of justice"); *Great Coastal*, 675 F.2d at 1355 ("Respect for the finality of judgments is deeply engrained in our legal system."); *Fox*, 739 F.3d at 136-37 (noting that proving fraud on the court presents a very high bar for any litigant).

*Auth.*, 657 F.2d 68, 71 (4th Cir. 1981) ("A party seeking relief under [Rule 60(b)(3)] must also prove the misconduct complained of by clear and convincing evidence.")); *Herring v. United States*, 424 F.3d 384, 386-87 (3d Cir. 2005) (requiring fraud on the court to be proven by "clear, unequivocal and convincing evidence" (internal quotation marks and citation omitted)); *see also Booker v. Dugger*, 825 F.2d 281, 284 n.4 (11th Cir. 1987) ("It is clear that the policy of finality of judgments requires the same, if not more stringent, standards [than the Rule 60(b)(3) clear and convincing evidence standard] be applied to independent actions alleging fraud on the court which are brought after the one year limit has run.")).

## IV.

In the case at bar, the Court finds that Higgs has failed to prove by clear and convincing evidence, first, that the Government in any sense committed fraud on the court by denying that Gloria received consideration from Baltimore city prosecutors in the Creighton murder case; and second, that the Government engaged in an intentional plot to deceive the Court during § 2255 proceedings; and third, even assuming the factual accuracy of Higgs's allegations, he has failed to establish that evidence of benefits to Gloria beyond those already disclosed to the defense would have made a material difference to the outcome of § 2255 proceedings.

### A. The Government's Alleged Fraud

Higgs grounds his claim of fraud on the court in certain assertions the Government made during the § 2255 proceedings. Specifically, he argues, the Government denied the existence of any consideration flowing to Gloria in the Creighton murder investigation in exchange for Gloria's cooperation in the Higgs and Haynes trials, despite knowing that in fact such consideration existed.

To support his claim, Higgs relies primarily on two documents in the BPD's investigative file that supposedly demonstrate direct, two-way communication between Baltimore authorities and AUSA Johnston regarding the Creighton murder. Thus, he points to a phone-message note dated April 12, 1999 from Baltimore City ASA Cohen and likely to Detective Robert Patton, in which Cohen explains that he spoke to Johnston about Gloria, and that she suggested the Scott twins might be falsely implicating Gloria. According to the message note, Johnston then suggested that Baltimore authorities should talk to the Park Police and FBI because they "could give us background on the case." R.60(d) Mot., Ex. 21 at 1, ECF No. 579-1. Cohen then wrote that "[a]fter we talk to these officers, we will decide on the next course of action, that is, either writ Gloria + charge him or talk to his lawyer about the case." *Id.* Higgs submits that it is hard to imagine what "background" the Government could have provided to state authorities that would have aided them in their deliberations, and that the "only logical conclusion" is that the "background" must have consisted of the Government informing state authorities that Gloria was a vital witness in the Higgs prosecution and that, on that basis, this information influenced state authorities. Pet.'s Repl. Br. at 2.

Higgs argues that Detective Patton's April 21, 1999 investigation report shows that the BPD embraced AUSA Johnson's version of events, further proving that federal intervention had a direct impact on Gloria not being charged. Patton wrote that:

> The U.S. Attorney's Office was advised by A.S.A. Cohen that Kevin Miller and the Scott Brothers had implicated Victor Gloria in the captioned Homicide. The U.S. Attorney reported that during [the] course of their Investigation they received information that the Scott brothers and Kevin Miller were close friends with Victor Gloria's co-defendant, Willis Haymes [sic] and Dustin Higgs and were aware that Victor Gloria was a Federal witnesses and plan[n]ed to testify against Hymes [sic] and Higgs. The U.S. Attorney believes that the implication of Victor Gloria by Kevin Miller and the Scott brothers is their form of retaliation against Gloria.

R.60(d) Mot., Ex. 22 at 2, ECF No. 579-1, and added that "[y]our Investigators along with A.S.A. Cohen believes that the A.U.S.A. is on track with their assumption." *Id.* Higgs also notes that, according to Patton's report, AUSA Johnston told Baltimore authorities that Gloria was due to testify against Higgs and Haynes, despite Johnston apparently telling Cohen nine days earlier that she could not reveal whether Gloria would testify, as his guilty plea was under seal.

Higgs suggests that considering this evidence in light of other facts – namely the Scott twins' and Miller's testimony that Gloria fought with Creighton; the testimony of Clarence White, Creighton's friend, from the night of the murder that a "light skinned" man swung at Creighton, causing him to grab his neck and leaving him badly bleeding; Gloria's previous involvement in violent criminal activity; and the various notes indicating police contact with Park Police and FBI and interest in the *Higgs/Haynes* murders – the "only plausible explanation" for the BPD's apparent failure to charge or even interview Gloria in connection with the Creighton murder was that the BPD "did not want to disrupt their federal colleague's prosecution of a capital triple homicide." Pet.'s Repl. Br. at 4. Since the evidence shows Gloria received lenient treatment in the Creighton case because of his cooperation in the Higgs case, Higgs argues, the Government's denial of that lenient treatment during § 2255 proceedings constituted fraud on the court.

The Government responds that Higgs has failed to establish any false statements by AUSA Johnston during § 2255 proceedings. Govt.'s Resp. at 25. In the Government's view, the BPD files show that local authorities conducted a thorough, independent investigation of the Creighton homicide, and decided not to charge Gloria not in response to a federal request, but based on their own independent review of the evidence. *Id.* at 20. Since the files fail to show Gloria was spared murder charges because of his cooperation, the Government's denial of lenient treatment during § 2255 proceedings was not a false statement. *Id.* at 24.

As noted, to prevail on his 60(d) Motion, Higgs must prove by clear and convincing evidence that the Government's § 2255 response to this Court fraudulently denied the fact that Baltimore authorities decided not to charge Gloria at the behest of the federal prosecutors. He has not done so. On the contrary, it is far more likely, as the Government has it, that throughout its investigation the BPD suspected Miller, not Gloria, was Creighton's killer, and that the Baltimore City State's Attorney's Office ultimately chose not to prosecute Gloria because of the lack of evidence that he was involved, especially in the face of strong evidence pointing to Miller. *See United States v. Antone*, 742 F.3d 151, 159 (4th Cir. 2014) (holding that "clear and convincing" evidence must render factual determination "highly probable" and produce a "firm belief or conviction" as to the truth of the allegations being sought to be established).

Again, before Baltimore authorities discussed the case with AUSA Johnston, three eyewitnesses with no obvious motive to lie to police independently identified Miller as the likely murderer (two doing so by name), and all three suggested Gloria was not even involved in the altercation. On July 19, 1998, one day after the murder, Creighton's friend Bishop told police that three men[7] were involved in the fracas, a "dark skinned man" (a description consistent with Miller and inconsistent with Gloria) and two men who "looked like brothers." R.60(d) Mot., Ex. 7 at 3, ECF No. 579-1. Bishop also described how the dark-skinned man struck Creighton and "cut him with something in his neck." *Id.* at 2. Just over a month later, Barbara Bailey claimed Gloria had run off before the fight, and described how she then saw Miller punch Creighton leaving him with blood all over his shirt. Less than a month after that, Charnetta Bailey gave a

---

[7] It is also worth noting that the first officer report on the homicide, dated July 18, 1998, reported that the victim "had been engaged in a[n] argument and altercation with *three* unidentified black males." R.60(d) Mot., Ex. 2, ECF No. 579-1. Later testimony indicating Gloria fled before the fight is consistent with this initial report; quite possibly, then, this would have made the BPD more inclined to believe the fight involved Miller, the Scott twins, and Creighton (the Baileys', Bishop's and White's version) and not Gloria, Miller, the Scott twins, and Creighton (the Scotts' and Miller's story).

similar account: Gloria ran off before the fight; Miller struck Creighton; and Creighton had blood on his neck.[8] Then, in March 1999, the police showed Charnetta Bailey photographs of Gloria and Miller, and she reportedly "without hesitation" identified Miller as being involved in the homicide, and failed to identify Gloria at all. Govt.'s Resp., Ex. 13 at 1, ECF No. 585-13. All these interviews took place before April 12, 1999 – the first recorded date of any contact between Baltimore authorities and AUSA Johnston. In marked contrast, the only eyewitness, besides the Scott twins and Miller, whose testimony pointed to Gloria being the murderer was Clarence White, a fifteen-year-old who later gave a conflicting account of the evening. The weight of evidence implicating Miller and exonerating Gloria to this point unquestionably supports the Government's position that the reason Gloria was not charged was because police concluded he was not involved.

Beyond this, it is clear that BPD had reason to doubt the reliability of the suspects' stories independent of the AUSA's input. Miller told Patton during his April 7, 1999 interview that the Scott twins had asked him for money and to be a witness for them, that he discussed the Creighton murder with both Scotts over the phone, that he knew what they had told police through the Scotts' girlfriends, and that he had received a letter from them while they were incarcerated about events the night of the Creighton murder.[9] Knowing this, the BPD had

---

[8] Higgs casts doubt on the Baileys' version of events, noting that they both told police they were walking away when the fight started. According to Higgs, the most straightforward interpretation of the Bailey sisters' statements is that they had their backs turned when Gloria stabbed Creighton, and only turned around in time to see Gloria run away. Pet's Repl. Br. at 9. That may be so, but it is beside the point. The Court's inquiry is not to determine Gloria's actual guilt or innocence, but instead whether the evidence tends to show that the BPD came to their own independent conclusion not to charge Gloria at the time. Both sisters told police that Gloria ran off before the fight, and that Miller struck Creighton. Whether what they said is actually true does not change the fact that police had independent testimony that Gloria had absented himself and Miller struck Creighton and made him bleed. That supports the Government's argument that the BPD's decision not to charge Gloria was based on their own review of the evidence.

[9] Admittedly, Miller equivocated on some of these facts, sometimes in the same breath. *See* R.60(d) Mot., Ex. 12 at 15-17, ECF No. 579-1.

independent reason to doubt the accuracy and reliability of these statements[10] in comparison to the independent statements implicating Miller, again making it more likely that the decision not to charge Gloria was based not on federal intervention, but on the Baltimore authorities' own assessment of strength of the evidence in their case.

The reasonable inference from all the foregoing is that AUSA Johnston's suggestion of collusion among the Scott twins and Miller with regard to their statements merely helped solidify the BPD in their own theory of the case, rather than amounting to federal pressure that changed the course of the Creighton murder probe. Patton's own words in his April 1999 Report say it all: professing his belief that Johnston was "on track with [her] assumption" about the Creighton suspects, Patton told his superiors that his conclusion was supported by "information that Victor Gloria ran from the scene prior to the stabbing" and eyewitnesses who "identified Kevin Anthony Miller via photographic line up as the stabber and the only person seen engaging the victim in physical altercation."[11] R.60(d) Mot., Ex. 22 at 2, ECF No. 579-1. In short, the BPD appears to have had a strong intimation that Miller was the murderer, that Gloria was not involved, and that the Scott twins and Miller were lying.[12]

---

[10] Indeed, in his April 12, 1999 Report, Detective Patton notes that his "assumption" that the suspects' statements were rehearsed was "supported when Kevin Miller stated during his initial interview that the Scott brothers called him from Jail several times and advised him that your Investigators were looking for him and that he would probably be arrested and charged with murder." R.60(d) Mot., Ex. 22 at 1, ECF No. 579-1.

[11] It is not entirely clear to the Court whom exactly Detective Patton is referring to when he speaks of "eyewitnesses" who identified Miller as the stabber from a photo line-up. As far as the record shows, at that point only one person (Charnetta Bailey) had identified Miller from a photo as involved in the homicide. This does not diminish the point, however, that at the time AUSA Johnston discussed the case with the Baltimore authorities, detectives already appeared to have a strong inclination that Miller, and not Gloria, was the murderer.

[12] It seems highly doubtful that AUSA Johnston would have known through the course of the *Higgs/Haynes* investigation that Haynes and Higgs knew the Scott twins and Miller and therefore was able to deduce the Scotts and Miller were conspiring against Gloria on behalf of Haynes/Higgs. There is no indication the Scott twins or Miller were in any way connected to the *Higgs/Haynes* murders, and if Haynes or Higgs were behind that scheme they probably would not say so. As Higgs suggests, then, it seems plausible the AUSA's knowledge of the friendship and theory of the conspiracy came from her questioning Gloria himself about the Creighton murder. But just because the information may have come from Gloria, does not by itself suggest – let alone prove – that the AUSA's divulging it

But there is more. Higgs's claim that the Baltimore authorities failed to charge Gloria so as not to upset the federal murder trial is further undermined by evidence that emerged subsequent to the Baltimore authorities' conversations with AUSA Johnston that strongly links Miller with the murder and casts further doubt on Gloria's involvement. On June 8, 1999, the police conducted a photographic line-up with Bishop, Creighton's friend, who had previously told police the day after the murder that Creighton was cut on the neck by a dark-skinned man. Bishop picked out Miller's photo from the six-man array and identified him as the person who stabbed Creighton, but failed to pick out Gloria from a separate array. Three days later, on June 11, Clarence White told detective Patton that three men were involved in the altercation with Creighton, and that the "brown skinned guy" stabbed him. R.60(d) Mot., Ex. 6 at 2-3, ECF No. 579-1. White also identified Miller from a photo line-up as looking like the person who stabbed Creighton, identified the Scott twins as both being present when the stabbing occurred, and failed to pick out Gloria from a line-up. Moreover, the fact that the Scott twins were later interviewed and both "failed" polygraph tests while maintaining their story implicating Gloria supports the Government's assertions that BPD independently chose to discount their version of events.

Higgs's claims of a quid pro quo between the Baltimore and federal authorities is further undermined by evidence that the BPD continued to treat Gloria as a suspect in the Creighton murder even after discussing the case with AUSA Johnston and even after learning he was to testify in the *Higgs/Haynes* trial. As the Government points out, ASA Cohen was still contemplating charging Gloria at that point, noting in his phone message that "[a]fter we talk to these officers, we will decide on next course of action, *that is, either writ Gloria + charge him or talk to his lawyer about the case*." R.60(d) Mot., Ex. 21 at 1, ECF No. 579-1 (emphasis added).

---

to state authorities was in some way an attempt to pressure them into dropping charges against Gloria, much less that it had such effect.

Then, too, in his April 21, 1999 investigation report, Detective Patton tells his superiors what efforts he planned to take to "finally discern who of the *four* listed suspects actually stabbed the victim," R.60(d) Mot., Ex. 22 at 2, ECF No. 579-1 (emphasis added). These statements suggest that the BPD still intended to treat Gloria as a suspect after speaking to the federal prosecutors, and that Baltimore authorities would make their own decision on the matter. What happened subsequently bears this out. In the months after Patton's April 1999 report, the BPD exposed both Bishop and White to photo line-ups containing Gloria's photo. It seems quite improbable that the BPD would go to that effort if it had by that point discarded Gloria as a suspect because of his acknowledged role in the federal case as Higgs claims. Higgs offers no explanation for this. In Detective Patton's follow-up report after re-interviewing the Scott twins, dated June 16, 1999, he continued to list Gloria as a suspect in the murder. Patton Rep. 2, Govt.'s Resp., Ex. 22 at 1, ECF No. 585-22.

Patton's June 16, 1999 Report reflects well the BPD's assessment of the case vis-à-vis Gloria weeks before the Scott twins and Miller were indicted for first-degree murder. Patton wrote that:

> Your Investigators will note that the Scott brothers in concert with Kevin Anthony Miller have conspired together and have given statement[s] implicating Victor Gloria. Your Investigators will note that three independent eyewitnesses have since positively identified Kevin Anthony Miller as the individual who stabbed the above victim.
>
> Those same witnesses are shown photographic arrays, which contained photographs of Victor Gloria and are unable to make an identification and in their statements that make no reference to Victor Gloria.

*Id.* at 2. Once more, the report shows Patton discounting Gloria as a suspect because of the lack of evidence linking him to the murder, in sharp contrast to the relatively strong eyewitness evidence implicating Miller. Patton appeared unwilling to believe the Scotts' and Miller's story

implicating Gloria, finding it self-serving and inherently suspicious, and in conflict with eyewitness testimony, all of which pointed to Miller striking Creighton and none of which unambiguously put Gloria at the scene during the fight. Patton had a particular reason to disbelieve their testimony because they had just "failed" a lie-detector test.

Higgs's argument suffers from other deficiencies as well. He does not sufficiently explain why state officials would have agreed to allow a murderer, which Higgs implies Gloria was, to escape prosecution and return to the streets just so the federal government could prosecute another set of defendants in an apparently unrelated case that did not take place in Baltimore. Higgs's response that the difficulty of the Creighton investigation somehow explains the BPD's willingness to help federal counterparts cuts no ice. Further, there is no evidence in the record showing federal authorities requested, urged, or even knew of the alleged lenient treatment of Gloria by Baltimore authorities. Higgs simply asks the Court to infer this from an alleged follow-up phone call in which state authorities purportedly sought "background" on the federal case at AUSA Johnston's suggestion.[13]  This is clearly insufficient to sustain the high burden of proof required to grant a Rule 60(d) motion. *See, e.g.*, *Apotex*, 507 F.3d at 1360-61 ("[Fraud-on-the-court] requires rigorous proof, as do other challenges to final judgment, lest the finality established by Rule 60(b) be overwhelmed by continuing attacks on the judgment.").

The Court has no trouble concluding that Higgs has failed to meet his "very high bar" of showing by clear and convincing evidence that Gloria received leniency in the Creighton case in exchange for his testimony in the federal trial. *See Fox*, 739 F.3d at 136-37; *see also Herring*,

---

[13] Recall that ASA Cohen's note contained names and phone numbers for the FBI and U.S. Park Police, along with instructions that its recipient call them for "background on the case" before deciding whether to charge Gloria. There is no direct evidence in the record, however, that anyone made these calls.

424 F.3d at 390 (employing a "demanding standard" for independent actions alleging fraud on the court). There was no fraud on the Court during § 2255 proceedings.[14]

It is therefore unnecessary to discuss at length the issue of materiality of the Government's supposed fraud. If there was no fraud, as the Court finds here, materiality is a moot point. Suffice it to here reiterate what the Court said when ruling on Higgs's § 2255 Motion:

> Even were the Court to find that the prosecution failed to turn over any of this evidence, and again assuming the factual accuracy of the supposed benefits, Higgs has not demonstrated its materiality. Gloria's credibility as a witness was thoroughly explored and impugned by Higgs' counsel through vigorous cross-examination. Gloria openly confessed to an extensive criminal history, going so far as to state that "if it is going to help Victor Gloria, Victor Gloria will do whatever he has to do." Unquestionably counsel established that Gloria was a witness of dubious reliability, whose testimony the jury could weigh accordingly. ***In other words, any evidence that Gloria may have received consideration for his testimony beyond that disclosed by the Government could not have further undermined his already low credibility, nor would it have created a "reasonable probability" of a more favorable verdict***.

*Higgs III*, 711 F. Supp. 2d at 508 (emphasis added).

### V.

### Higgs's Discovery Motion

In company with his Rule 60(d) Motion, Higgs asks the Court to order the Government to turn over all evidence in its possession relating to the Baltimore authorities' investigation of Creighton's murder, and grant a discovery request the Court previously denied. *See* Pet.'s Mot. Disc. at 2-4, ECF. No. 580. Although he does not clearly articulate whether he seeks discovery to

---

[14] Furthermore, to the extent Higgs claims the Government intentionally deceived the court, his claims necessarily fail because, as the Court finds, he has failed to establish that any statement by the Government in connection with § 2255 proceedings was deceitful or fraudulent. See *Great Coastal*, 675 F.2d at 1356 (holding that petitioner must prove "deliberately planned and carefully executed scheme to defraud" the court (quoting *Hazel-Atlas Glass*, 322 U.S. at 245-46)); *see also Fox* 739 F.3d at 136 (holding fraud on the court requires "an intentional plot to deceive the judiciary").

supplement the record in relation to his Rule 60(d) Motion, or proceeds under the assumption that the Court will revisit his § 2255 claim, either way, the Court declines to grant the request.

Rule 60(d) has no discovery provision, and Higgs offers no cases, and the Court has found none from this circuit, to support his request for such discovery. The First Circuit in *Pearson v. First NH Mortg. Corp.* has held that courts may consider such a request in the Rule 60(d) context and exercise its discretion to permit discovery "once the record evidence demonstrates a 'colorable' claim of fraud [on the court]." *Pearson v. First NH Mortg. Corp.*, 200 F.3d 30, 35 (1st Cir. 1999). And a "colorable" claim has been defined as one "appearing to be true, valid, or right." *Bowie v. Maddox*, 677 F.Supp.2d 276, 285 (D.D.C. 2010) (applying *Pearson* to reject discovery request in context of fraud-on-the-court motion because plaintiff presented only "bare allegations and evidence that points to the mere possibility of fraud on the court" and nothing that "makes his claim appear to be true").

The Sixth Circuit in *H.K. Porter Co., Inc. v. Goodyear Tire & Rubber Co.* has held that a litigant seeking discovery to prove fraud-on-the-court claims must first "present some proof to establish" its charges. 536 F.2d 1115, 1122 (6th Cir. 1976); *see also Jones v. Ill. Central R.R. Co.* 617 F.3d 843, 853 (6th Cir. 2010) (holding, with minimal analysis, that under *H.K. Porter* a district court entertaining a discovery request under Rule 60(d) may "require the moving party to make some evidentiary showing of fraud before granting post-trial discovery or an evidentiary hearing"). The court stressed that "a request for discovery for the purpose of attacking a final judgment involves considerations not present in pursuing discovery in a pending action prior to a judgment," chief among them "the public interest of the judiciary in protecting the finality of judgments." *H.K. Porter Co.*, 536 F.2d at 1118. District courts applying *H.K. Porter* have required a prima facie showing of likely success on the merits of the fraud-on-the-court claim

before permitting post-judgment discovery. *See Signtech USA, Ltd. v. Vutek, Inc.*, No. CIVASA-95-CA-0226NN, 1999 WL 33290625, at *2-3 (W.D. Tex. Aug. 9, 1999); *accord Valerio v. Boise Cascade Corp.*, 80 F.R.D. 626, 646 (N.D. Cal. 1978) ("The question then is whether [the] evidence demonstrates fraud on the court.") *aff'd*, 645 F.2d 699 (9th Cir. 1981)).[15]

But the Court need not adopt one standard or the other for the purposes of Higgs's motion. Under either *Pearson*'s "colorable claim" standard or *H.K. Porter*'s prima facie standard, Higgs has failed to proffer sufficient evidence to support his discovery request.

Alternatively, assuming as the Government does, that Higgs seeks discovery on the condition that his § 2255 Motion is reopened and the Court's judgment set aside, his request would be denied. Since the Court has found no basis to reopen § 2255 proceedings, there is no occasion for discovery.

---

[15] The only case the Court could find in which a district court has permitted discovery in connection with fraud-on-the-court allegations is *Whitmore v. Symons Intern. Grp., Inc.*, No. 1:09–cv–0391, 2011 WL 806624 (S.D. Ind. March 1, 2011). There, a creditor had obtained a $34 million judgment against its debtor, but prior to execution, a third party sued the same debtor for allegedly defaulting on $316 million worth of notes. *Id.* at *1. The debtor consented to a judgment on the entire $316 million before the original $34 million order became executable, and the second creditor thereby took priority over the first. *Id.* The original creditor intervened alleging fraud on the court in the form of collusion between the debtor and the third party. *Id.* Finding the debtor's failure to contest "highly unusual" in light of the high amount of the award and the debtor's historical litigiousness, and noting circumstantial evidence that the parties may not be adverse, the court (albeit with little discussion) found the evidence demonstrated a colorable claim of fraud sufficient to warrant post-judgment discovery. *Id.* at *2. Higgs's case differs from *Whitmore* not only because Higgs has, unlike the petitioner in that case, already obtained considerable evidence to support his motion, but also because the evidence he does present does not (for all the reasons explained above) rise to the same level of suspicion as the defendant's failure to contest did in *Whitmore*.

# VI.

## Conclusion

For the reasons stated above, Higgs's Motion for Relief from Final Judgment Pursuant to *Hazel-Atlas Glass Co.* and Federal Rule of Civil Procedure 60(d) is **DENIED**. Higgs's Motion for Production of Exculpatory Evidence and Renewed Motion for Discovery is also **DENIED**.

A separate Order will **ISSUE.**

_____**/s/**_____
**PETER J. MESSITTE**
**UNITED STATES DISTRICT JUDGE**

**June 29, 2016**